John ANGLE and Clyde Freeman, Plaintiffs,

v.

Mike DOW, Mayor, and Harold Johnson, Chief of Police for the City of Mobile, Defendants.

Civ. A. No. 92–0344–AH–C.

United States District Court, S.D. Alabama, S.D.

June 1, 1993.

---

R. Jeffrey Perloff, Reich, Friedman, Perloff and Ross, Mobile, AL, for plaintiffs.

John R. Lockett, J. Barry Abston, Cherry, Givens, Tarver, Peters, Lockett and Diaz, P.C., Mobile, AL, for defendants.

K.W. Michael Chambers, McRight, Jackson, Dorman, Myrick and Moore, Mobile, AL, for Chief Johnson.

## OPINION & ORDER

HOWARD, Chief Judge.

This cause is before the Court on Defendants' motions for summary judgment on the merits, and to dismiss or in the alternative for summary judgment based on qualified immunity. [Docs. 34, 36, 39]. Count one of Plaintiffs' second amended complaint charges that Defendants Michael C. Dow, Mayor of Mobile, and Mobile Police Chief Harold Johnson terminated police officer John Angle in retaliation for his exercise of his rights to freedom of speech on a matter of public concern. After typing a memorandum critical of a plainclothes unit in the Mobile Police Department, known as "the Chief Squad," Angle allegedly was charged with violation of subsection 1/14 of procedural general order 55 (hereinafter "subsection 1/14"), and terminated following a predisciplinary hearing. Count two alleges that the Defendants' actions deprived Plaintiff Angle of his right to freedom of speech under the First Amendment and deprived him of his property without due process of law. Count three states that Defendants discharged Plaintiff Angle in violation of his rights under the First Amendment. Count four alleges that Defendants ordered officer Rose Brunson, a witness subpoenaed by Angle to testify before the Mobile County Personnel Board, not to appear at the Plaintiff Angle's Personnel Board hearing on January 20, 1992, and that such act constituted the tort of outrage and a deprivation of property without due process of law. Count five alleges that Plaintiff Clyde Freeman has been unconstitutionally sanctioned for past violations of subsection 1/14 in that Defendant Chief Johnson has instigated and interfered with internal affairs investigations of Freeman in retaliation for his exercise of free speech on matters of public concern. Count five also states that subsection 1/14 is unconstitutionally overbroad, void for vagueness, and a prior restraint of Plaintiffs' right to free speech.

Count six of Plaintiffs' third amended complaint alleges that Plaintiff Freeman "followed the chain of command" to obtain permission to address the media on matters of public concern, after which he was told to itemize each such matter, and that on November 2, 1992 he was denied permission to comment on such matters in violation of his rights under the First Amendment.[1] Plaintiffs seek a declaratory judgment that subsection 1/14 is unconstitutional, as well as injunctions declaring Angle's termination unconstitutional, ordering his reinstatement, and restraining Defendants and their employees, agents and servants from enforcing subsection 1/14. The pretrial document has clarified the redundance and overlap in Plaintiffs' amended complaints: Angle's First Amendment claims in counts one through three are really one claim for retaliatory discharge, and Angle's due process claims in counts two and four are now one due process claim. For the reasons that follow, Defendants' motions for summary judgment are **GRANTED IN PART AND DENIED IN PART.**

## FINDINGS OF FACT

On June 8, 1991, around 3:30 P.M., Plaintiff John Angle typed a memorandum[2] on an intra-departmental police form as a joke after an incident where he and another officer stopped two female undercover officers following him while he was on routine patrol. Angle typed the memorandum on the typewriter at the Third/North precinct at 608 Phillips Drive, Mobile. The memo was addressed to "ALL INTERESTED PERSONS" and concerned the "CHIEF'S SQUAD (PIMPS)." The memorandum described a black female driver, Regina Dennard, and gave her date of birth and social security number. The memorandum also described the other passenger as Rose Brunson, a white female. The memorandum twice mentioned a black MR 2, the police vehicle driven by the two women, and also stated the tag number on the MR 2. The memorandum also stated that "THESE SUBJECTS

---

**1.** Plaintiffs' third amended complaint does not state who denied Freeman permission to hold a press conference, but triable issue no. 5 at page six of the amended pretrial document [Doc. 59] states "whether Chief Johnson or Mayor Dow denied Freeman permission to hold a press conference" is at issue.

**2.** The memorandum is attached as Appendix I to the Court's Order.

WERE CAUGHT YET A SECOND TIME AT THE REAR OF THE TACO BELL ON GOVERNMENT STREET APPARENTLY WATCHING TO SEE . IF THE RANGER UNITS ATE THEIR TACOS IN A TIMELY MANNER." After typing the memo and talking and joking about it with some other police officers, Angle decided the joke had gone far enough. He therefore crushed the memo into a ball and threw it into a nearby trash can. Angle did not intend to circulate the memorandum other than to his friend Rose Brunson, one of the ·undercover ·officers, or her husband. At the time he typed the . memo, Angle "wanted to bring to light ... the situation with the Chief's squad" and "felt that the situation with the squad needed to be addressed." [3] According. to Angle, he did not type the letter "as part of the duty of a police officer." Thereafter, the memo was removed from the garbage and posted by unknown means in the training section at the First/South Precinct in Mobile on June 12, 1991.

On June 18, 1991 Angle made and signed a statement to Corporal Ted Bilbo of the internal affairs section regarding the memorandum. Angle received a predisciplinary action notice on July 16, 1991, charging him with violation of eleven different Police Department rules and regulations, including conduct unbecoming an employee. in the public service (Personnel Board Rule 14.2(c)) and criticism (Procedural General Order 55, subsection 1/14). The notice stated that "[b]y writing this letter, you compromised the undercover officers' future safety and drug investigations, act [sic] which indicates total irresponsibility on your part." On July 19, 1991 Deputy Chief Ronald Wilhelm held a predisciplinary hearing with Angle. On September 6, 1991 Mayor Dow wrote Angle a letter adopting Deputy Chief Wilhelm's decision to terminate him over the memorandum incident. Angle . appealed this decision to the Mobile County Personnel Board on September 23, 1991.

The Personnel Board conducted a hearing on the matter on January 30, 1992, at which

Claude Boone, Esquire, represented Angle. The Board affirmed Angle's dismissal on February 4, 1992, noting that the critical charge brought against Angle was conduct unbecoming an employee in the public service. The Board dismissed some of the charges against Angle, but in the critical part of its decision found that Angle played recklessly with the lives of his fellow officers, comparing his actions to playing Russian Roulette with the lives of his fellow officers. The Board found that the "drafting and distribution of that memo placed the lives of two undercover officers in unnecessary danger and that obviously is not a joking matter." Angle's attorney Claude Boone subpoenaed officer Rose Brunson to testify at the hearing on Angle's behalf, but she was ordered "by one of [her] superiors to ignore the subpoena and not to attend the hearing." [4] On September 1, 1992 the Circuit Court of Mobile County approved and affirmed the Personnel Board's decision. Angle did not pursue any further appeals of his termination by Mayor Dow.

Plaintiff Clyde Freeman is President of the Mobile County Law Enforcement Association. Around March, 1991 Freeman and Terry Hicks, the former president of the Policeman's Benevolent Association (PBA), presented to Mayor Dow a letter of complaints on behalf of the PBA and the Mobile County Law Enforcement Association. According to Freeman, Mayor Dow took no action on the letter and stated "do whatever you need to do." Freeman then forwarded the March, 1991 letter containing these complaints to City Councilwoman Jane Baxter, one of three members of the Public Safety Committee of the Mobile City Council. The letter is not in the record, and the only reference in the record to its content concerns "an officer [Max Mahathy] reporting another officer coming to him with a stolen gun wanting to sell it." [5] According to Freeman, in reprisal, internal affairs "came to his [Mahathy's] house and made an illegal search." [6]

---

3. Angle deposition at 14.

4. June 11, 1992 affidavit of Rose Brunson.

5. Hicks deposition at 11–12.

6. Freeman deposition at 16. Freeman's deposition also reveals the following information about the letter: "[it] told about all the allegations of wrongdoings that were within the department where that officer had been involved in leaving

After Freeman and Hicks forwarded the March, 1991 letter to the Public Safety Committee, Mayor Dow summoned Freeman to his office, and according to Freeman, "threatened me with my job in the presence of Mr. Lockett[, the City Attorney]." According to Freeman, he has consistently been harassed by Chief Johnson since that time.[7]

In the fall of 1991 an intradepartmental survey on Chief Johnson was conducted and sent out to police officers, and the results were tabulated by an independent accounting firm. The survey is not part of the record, and there is no evidence either of the content of the survey or of any participation by Freeman in the survey.

Freeman also contends that Lieutenant Mike Roland, at the direction of Chief Johnson, ordered him not to criticize Chief Johnson or Mayor Dow. Roland also allegedly stated it was "a direct order . . . passed down through the chain of command." According to Freeman, Roland stated that he was acting pursuant to the PGO's (Procedural General Orders). A Sergeant Homer Floore was also present according to Freeman. Both Roland and Floore have submitted affidavits denying this incident ever took place.

On October 27, 1992 Freeman attempted to comply with subsection 1/14 and presented to Deputy Chief Wilhelm a list of nine (9) items he wished to discuss at a press conference.[8] According to Freeman, he met with Wilhelm on or about October 30, 1992, and Wilhelm told him he had "discussed the matter with Chief Johnson and it would not be a good idea." Freeman understood this to be a direct order from Chief Johnson not to

attend the press conference, and he did not do so. Chief Johnson, in an affidavit, states that "I have never instructed or otherwise ordered anyone to deny Officer Clyde Freeman permission to hold or participate in a press conference."

## CONCLUSIONS OF LAW

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted:

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.[9]

"A factual dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is 'material' if it might affect the outcome of the suit under the governing substantive law."[10]

The basic issue before the Court on a motion for summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.[11] The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden the Court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party.[12] If reasonable minds might differ on the inferences arising from undisputed facts, then the court must deny summary judgment.[13] Where the nonmoving party, as

---

the scene of an accident and wrecking a City vehicle, no action was taken. Where the high ranking police official had—could not explain for missing money, missing jewelry and—like I said, I don't have that here in front of me. It's about a two-page letter." Freeman deposition at 41.

**7.** Freeman deposition at 50.

**8.** The list is contained in a letter attached to the Court's Order as Appendix II.

**9.** Fed.R.Civ.P. 56(c).

**10.** *Beck v. Somerset Technologies, Inc.,* 882 F.2d 993, 996 (5th Cir.1989) (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)); *accord, Tipton v.*

*Bergrohr GMBH–Siegen,* 965 F.2d 994, 998 (11th Cir.1992).

**11.** *Anderson, supra,* 477 U.S. at 251–52, 106 S.Ct. at 2511–12.

**12.** *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Tipton, supra,* 965 F.2d at 998–99; *Johns v. Jarrard,* 927 F.2d 551, 555 (11th Cir.1991) (*quoting Apcoa, Inc. v. Fidelity National Bank,* 906 F.2d 610, 611 (11th Cir.1990)).

**13.** *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir.1992) (*citing Mercantile Bank & Trust v. Fidelity & Deposit Co.,* 750 F.2d 838, 841 (11th Cir.1985)).

here, bears the burden of proof at trial, the burden on the moving party may be discharged by 'showing'—that is, by pointing out to the District Court—that there is an absence of evidence to support the nonmoving party's case.[14]

Once the movant satisfies its initial burden under Rule 56(c) of demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmovant to "come forward with specific facts showing that there is a genuine issue for trial."[15] Otherwise stated, the nonmovant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment."[16] "A mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party".[17] The nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole.[18] "[T]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."[19] "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."[20]

The moving party may also seek summary judgment by demonstrating the absence of an essential element of a cause of action as to which nonmoving party has the burden of proof. On such a showing, unless the nonmoving party offers proof sufficient to establish the existence of the essential element, the moving party will be entitled to judgment as a matter of law,[21] since a complete failure of proof on an essential element means that there is no longer a genuine issue of material fact.[22]

## I. QUALIFIED IMMUNITY

■ Qualified or "good faith" immunity is an affirmative defense that must be pleaded by a government official. The principle of qualified immunity shields "government officials performing discretionary functions generally . . . from liability for civil damages insofar as their conduct does not violate clearly established rights of which a reasonable person would have known."[23] However, qualified immunity is not a defense to suits seeking equitable or injunctive relief.[24] *Harlow* tightly constrains causes of action under section 1983.[25] The conduct of the defendant public official must be measured against "clearly established law."[26]

A right is clearly established only if the "contours of the right [are] sufficiently clear that a reasonable official would understand

---

**14.** *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

**15.** *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (*quoting* FED. R.CIV.P. 56(e)) (emphasis removed) (internal quotation marks omitted).

**16.** *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). The shifting burden from movant to nonmovant at summary judgment described above applies regardless of which party will bear the burden of proof at trial. *Id.* at 607.

**17.** *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.1990).

**18.** *Tipton, supra*, 965 F.2d at 998 (*citing United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962)).

**19.** *Id.* at 999 (*quoting Anderson, supra*, 477 U.S. at 255, 106 S.Ct. at 2513, *in turn citing Adickes, supra*, 398 U.S. at 158–59, 90 S.Ct. at 1609).

**20.** *Matsushita, supra*, 475 U.S. at 587, 106 S.Ct. at 1356 (citation omitted).

**21.** *See Real Estate Financing v. Resolution Trust Corp.*, 950 F.2d 1540, 1543 (11th Cir.1992) (*citing Celotex, supra*, 477 U.S. at 322–23, 325, 106 S.Ct. at 2552–53, 2554).

**22.** *Tidmore Oil Co. v. BP Oil Co./Gulf Products Div.*, 932 F.2d 1384, 1388 (11th Cir.1991) (*citing Celotex, supra*, 477 U.S. at 323, 106 S.Ct. at 2552).

**23.** *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). For an excellent discussion of the purposes of qualified immunity and the procedural options available to defendants seeking to invoke the protections of qualified immunity *see Marx v. Gumbinner*, 855 F.2d 783, 788–89, 792 (11th Cir.1988).

**24.** *Fortner v. Thomas*, 983 F.2d 1024, 1028–29 (11th Cir.1993).

**25.** *Dartland v. Metropolitan Dade County*, 866 F.2d 1321, 1322 (11th Cir.1989) (*citing Barts v. Joyner*, 865 F.2d 1187, 1189 (11th Cir.1989)).

**26.** *Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir.1988) (*citing Harlow, supra*, 457 U.S. at 818, 102 S.Ct. at 2738).

that what he is doing violates that right."[27] "Although the standard is fact-specific, it is not one of factual rigidity."[28] The Court must be convinced of the existence of a clear, factually-defined, well-recognized right of which a reasonable public official should have known.[29] The very conduct in question need not have previously been held explicitly unlawful, but in light of pre-existing law the unlawfulness must be apparent.[30] The Court must assume the position of an objective, reasonable government official.[31] This objective reasonableness standard protects all public officials except for the plainly incompetent or those who knowingly violate the law.[32] The essential question is whether a reasonable official could have believed his or her action to be lawful in light of clearly established law and the information possessed by the official at the time the conduct occurred.[33] The nonexistence of a decision specifically addressing the alleged right is a significant consideration in determining whether the right is clearly established, and the existence of Supreme Court cases or cases in this Circuit that recognize the alleged right is particularly important in determining whether the law is sufficiently clear to a reasonable official.[34]

The objective reasonableness standard is applied through a two-part analysis. First, the defendant public official must prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.[35] A government official proves that he acted within the "purview" of his discretionary authority by showing objective circumstances that would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority.[36]

Second, once the Defendant meets his initial burden, the burden shifts to the plaintiff to demonstrate that the defendant public official's actions violated clearly established statutory or constitutional rights. The Court must decide two questions of law in analyzing whether a plaintiff has met his burden; it must first ascertain what law was clearly established at the time of the public official's actions, and it must decide whether the plaintiff has adduced evidence sufficient to create a genuine issue of fact as to whether the defendant engaged in conduct that violated rights guaranteed by the clearly established law.[37] Thus, under the aforementioned anal-

27. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Thus, for example, it is insufficient to claim that the First Amendment provides one with a right to freedom of speech and then to allege that such right has been violated. The level of generality at which the relevant legal rule is to be identified must be clearly established in a more particularized, and hence more relevant, sense. *See id.* at 639–40, 107 S.Ct. at 3038–39; *see also Horlock v. Georgia Dep't of Human Resources*, 890 F.2d 388, 394 (11th Cir.1989) (same), *vacated & dismissed on settlement, see Bennett v. Parker*, 898 F.2d 1530, 1534, n. 1 (11th Cir.1990) (Tjoflat, C.J., concurring), *cert. denied*, 498 U.S. 1103, 111 S.Ct. 1003, 112 L.Ed.2d 1085 (1991). *See also Dartland, supra*, 866 F.2d at 1323 (Plaintiff cannot not meet his burden by making "general conclusory allegations of a constitutional violation or by stating broad legal truisms").

28. *Stewart v. Baldwin County Board of Education*, 908 F.2d 1499, 1504 (11th Cir.1990).

29. *Dartland, supra*, 866 F.2d at 1323 (citation omitted).

30. *Ibid; Anderson, supra*, 483 U.S. at 641, 107 S.Ct. at 3039.

31. *Nicholson v. Georgia Dep't of Human Resources*, 918 F.2d 145, 147 (11th Cir.1990).

32. *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

33. *Stough v. Gallagher*, 967 F.2d 1523, 1526 (11th Cir.1992) (*quoting Nicholson, supra*, 918 F.2d at 147); *see, e.g., Bank of Jackson County v. Cherry*, 980 F.2d 1362, 1370 (11th Cir.1993) (the cases on which appellant "relies are simply too far afield from the facts of the present case to put reasonable, objective officials on notice that" the challenged action "might infringe [appellant's] First Amendment rights").

34. *Fortner v. Thomas*, 983 F.2d 1024, 1028 (11th Cir.1993).

35. *Stough, supra*, 967 F.2d at 1526 (*quoting Rich, supra*, 841 F.2d at 1563–64); *Lowe v. Aldridge*, 958 F.2d 1565, 1569–70 (11th Cir.1992); *Stewart v. Baldwin County Bd. of Educ.*, 908 F.2d 1499, 1503, n. 1 (11th Cir.1990).

36. *Sims v. Metropolitan Dade County*, 972 F.2d 1230, 1236 (11th Cir.1992) (*quoting Hutton v. Strickland*, 919 F.2d 1531, 1537 (11th Cir.1990)).

37. *Stough, supra*, 967 F.2d at 1526 (*quoting Rich, supra*, 841 F.2d at 1564); *Stewart v. Baldwin County Board of Education*, 908 F.2d 1499, 1503, 1506 (11th Cir.1990) (citations omitted); *see also Fortner v. Thomas*, 983 F.2d 1024, 1028 (11th Cir.1993).

ysis public officials will be entitled to qualified immunity in two situations: 1) when the law that they allegedly violated is not clearly established; and 2) when the law is clearly established and the Court decides that the Defendant's conduct did not violate any of the plaintiff's rights under clearly established law.[38]

A defendant seeking summary judgment on qualified immunity grounds must establish both that he is entitled to summary judgment as a matter of law and that there are no genuine issues of material fact pertinent to those questions of law.[39] The Court must consider in the light most favorable to the plaintiff all facts fairly inferable from the record, and determine whether the inferable facts, if true, constitute a violation of clearly established law by the defendants.[40] If the record and presentations of the parties demonstrate "a genuine issue of material fact as to whether the [public official's] conduct violated the right accruing to the plaintiff under clearly established law,"[41] the Court must deny summary judgment and allow "the fact-finder to decide at trial whether the official violated the clearly established law."[42] However, the existence of material disputed facts will not defeat summary judgment in favor of a public official if the plaintiff fails to make a showing sufficient to establish the existence of an element essential to the plaintiff's case, and on which he will bear the burden of proof at trial. In such circumstances, the public official will be entitled to judgment as a matter of law because the plaintiff has failed to carry the burden of proving a prima facie case.[43]

Defendants Mayor Michael C. Dow and Police Chief Harold Johnson assert that they are entitled to qualified immunity on Plaintiffs' claims against them in their individual capacity.[44] There is no dispute that Defendants acted within the scope of their discretionary authority in denying Freeman permission to hold a press conference, if in fact they did so. Therefore, the Court will examine the clearly established law, the second step of qualified immunity analysis.

Defendants rely entirely on *Dartland v. Metropolitan Dade County*,[45] where the Eleventh Circuit formulated a special test for qualified immunity in First Amendment retaliation cases. In *Dartland*, the Court of Appeals noted the absence of a bright-line standard for public employee speech, stating that the Supreme Court has instead used the so-called *Pickering* test to "balanc[e] the interest of the employee in commenting on matters of public concern against the interest of the employer in performing public services efficiently."[46] The Eleventh Circuit concluded that "[b]ecause no bright-line standard puts the reasonable public employer on notice of a constitutional violation, the employer is entitled to immunity except in the extraordinary case where *Pickering* balancing would lead to the inevitable conclusion that the discharge of the employee was unlawful."[47] There is no cause of action against an employer unless the law clearly proscribes the termination at issue. To decide a motion for summary judgment based on qualified immunity in these circumstances, the Court need not decide the precise result of applying the *Pickering* balancing test to a particular case;

**38.** *Courson v. McMillian*, 939 F.2d 1479, 1488, n. 14 (11th Cir.1991).

**39.** *Rich v. Dollar, supra*, 841 F.2d at 1562.

**40.** *Burrell v. Board of Trustees of Georgia Military College*, 970 F.2d 785, 790 (11th Cir.1992) (*quoting Bennett v. Parker*, 898 F.2d 1530, 1535, n. 2 (11th Cir.1990) (Tjoflat, C.J., concurring), *cert. denied*, 498 U.S. 1103, 111 S.Ct. 1003, 112 L.Ed.2d 1085 (1991) (other citation omitted)); *see also McDaniel v. Woodard*, 886 F.2d 311, 313 (11th Cir.1989).

**41.** *Rich, supra*, 841 F.2d at 1565.

**42.** *Howell v. Evans*, 922 F.2d 712, 718 (11th Cir.1991) (resolving intra-circuit jurisdictional conflict).

**43.** *Bennett v. Parker*, 898 F.2d 1530, 1532 (11th Cir.1990).

**44.** Because the Court is granting summary judgment on the merits for Defendants on all of Plaintiff Angle's claims, and one of Plaintiff Freeman's two claims, the Court's qualified immunity analysis applies only to Plaintiff Freeman's surviving claim under count six of Plaintiffs' third amended complaint.

**45.** 866 F.2d 1321 (11th Cir.1989).

**46.** *Ibid* (citing *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)).

**47.** *Ibid* (italics in original).

the Court "must decide only whether the result would be such that a reasonable official ... would necessarily know that the termination of" the Plaintiff under the circumstances in this particular case violated his constitutional rights.[48] The question is whether "in the light of prevailing legal standards, [the police department's] interest in efficiently operating the police department arguably outweigh[s] plaintiffs' free-speech rights on a matter of public concern."[49]

Defendants have unsurprisingly not attempted to clarify how *Dartland* would apply to each of the six counts in Plaintiffs' amended complaints, but rather, have simply moved for qualified immunity as to all counts, styling their motions "to dismiss, or in the alternative, for summary judgment." The imprudence of carelessly presenting the defense of qualified immunity in such a manner should be self-evident: not only do different standards of review apply depending upon the posture of the motion, but a denial of a motion to dismiss is not immediately appealable, whereas a denial of a motion for summary judgment based on qualified immunity is immediately appealable, and often results in extended delays before the case is returned to the district court.

Defendants also err in relying on *Dartland*. *Dartland* applies to cases where *Pickering* balancing is at issue, that is, where a public employer has discharged a public employee or taken similar adverse action in retaliation for the employee's exercise of constitutionally protected speech. It does not apply to procedural due process claims, nor does it apply directly to count six of Plaintiffs' third amended complaint, alleging that

Defendants denied Freeman permission to speak out on certain issues at a press conference. Because the Court has granted summary judgment on the merits of Plaintiff Angle's due process claim, the Court need not review the clearly established law with respect to such claim. However, as to count six, a review of clearly established First Amendment law is of paramount importance.[50]

The question in this action is whether the law on November 2, 1992 was such that a reasonable public official would necessarily know that denying Plaintiff Freeman permission to speak under the facts of this particular case violated his clearly established constitutional rights under the First Amendment. Plaintiffs have totally failed to meet their burden of demonstrating that Defendants knowingly violated clearly established law, or that in light of pre-existing law the unlawfulness of Defendants' actions was apparent.

Plaintiffs rely heavily on *Eiland v. City of Montgomery*.[51] In *Eiland,* the Eleventh Circuit held in 1986 that a police corporal's interests in speaking on an issue of intense public interest outweighed the Montgomery police department's interests in suppressing that speech. *Eiland* involved a satirical poem critical of the mayor of Montgomery and some members of its police department. The poem was posted in a Montgomery police station around the time of the mayoral election campaign. The Eleventh Circuit emphasized that its holding was a narrow one, and recognized the need of police departments, as quasi-military entities, to secure discipline and efficiency. The Court

---

**48.** *Id.* at 1324. Despite *Dartland*'s seemingly insurmountable language, the Eleventh Circuit has not hesitated to uphold denials of summary judgment on qualified immunity in particular First Amendment contexts. *See Stough v. Gallagher, supra,* 967 F.2d at 1528–29; *Stewart v. Baldwin County Board of Education, supra,* 908 F.2d at 1506; *see Oladeinde v. City of Birmingham,* 963 F.2d 1481, 1487 (11th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1586, 123 L.Ed.2d 153 (1993) (motion to dismiss); *but see Busby v. City of Orlando,* 931 F.2d 764, 774–75 (11th Cir.1991) (*per curiam* ); *McDaniel v. Woodard, supra,* 886 F.2d at 314–15.

**49.** *Oladeinde v. City of Birmingham, supra,* 963 F.2d at 1487.

**50.** The Court notes that neither Defendants nor Plaintiffs have attempted to ascertain the clearly established law with respect to count six of Plaintiffs' third amended complaint. Because a denial of a motion for summary judgment on qualified immunity is immediately appealable, a correct analysis of clearly established law is of the utmost importance, yet the parties have made hardly any effort to distinguish the different claims at issue in this action.

**51.** 797 F.2d 953 (11th Cir.1986), *cert. denied,* 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987).

stated that had the police corporal's speech "not occurred in the context of the mayoral election campaign, nor had [it] been relevant to an issue of public concern in that campaign, our result no doubt would be different." [52] *Eiland's* narrow holding therefore applies only in a political, electoral context. To analogize and apply *Eiland* to the entirely distinct set of facts at issue here would be to defy the clear mandate of the Court of Appeals limiting its holding to a political, electoral context. The Court must therefore look to other established law to determine to what degree the First Amendment protected Freeman's right to hold a press conference on important and potentially scandalous matters.

■ The touchstone of analysis for police officer speech is that employees of a law enforcement agency are subject to greater First Amendment restraints than most other citizens.[53] Defendants' case is strengthened by the fact that the police department is a quasi-military organization. Courts should consider and give weight to the need for maintaining a close working relationship in quasi-military organizations like police departments.[54] The Eleventh Circuit has expressly declared that it "recognize[s] and give[s] appropriate weight to previous authority setting forth the need of police departments to secure discipline and efficiency as a quasi-military entity." [55] "[Q]uasi-military organizations have special disciplinary concerns. Quasi-military organizations ... generally by necessity must cast regulations in broad terms. Additionally, institutions such as the military and the police have needs 'which must demand a high level of discipline and duty of their members in order to function effectively for the good of all members of society.' " [56] Although police of-

ficers need not suffer a "watered-down version" of their constitutional rights, "the state's interest in regulating its police force can be especially compelling." [57] Comments concerning superior officers' integrity can directly interfere with the confidentiality, esprit de corps and efficient operation of a police department.[58] Police departments have a substantial interest in developing discipline, esprit de corps, and uniformity to insure adequate promotion of safety of persons and property. When a police department can show that the speech in question *actually disrupts* the officer's efficiency or the internal operation of the department or that the speech has the *reasonable tendency to lead to such disruption,* a court should not substitute its judgment for that of the department.[59] "The need for high morale and internal discipline in a police force [has] led [the Eleventh Circuit] to hold that 'a reasonable likelihood of harm [ (as opposed to *actual* harm) ] generally is ... enough to support full consideration of the police department's asserted interests in restricting its employees' speech." [60]

■ This survey of clearly established law demonstrates the difficulties faced by Plaintiff Freeman in defeating Defendants' motion for summary judgment based on qualified immunity. Although the aforementioned cases are *Pickering* balancing cases not directly implicated by Freeman's First Amendment claim, the general principles discussed are applicable in a law enforcement officer free speech context. Similarly, while *Dartland, supra,* is not exactly on point, the general principle still holds that "no bright-line standard puts the reasonable public employer on notice of a constitutional violation" in a First Amendment situation. While Plaintiff Freeman undoubtedly possesses a

**52.** *Id.* at 960.

**53.** *McMullen v. Carson,* 754 F.2d 936, 938 (11th Cir.1985) (*citing Kelley v. Johnson,* 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976)).

**54.** *Busby, supra,* 931 F.2d at 774.

**55.** *Eiland v. City of Montgomery,* 797 F.2d 953, 960 (11th Cir.1986), *cert. denied,* 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987) (*dictum* ).

**56.** *Busby, supra,* 931 F.2d at 774–75 (citations omitted).

**57.** *Eiland, supra,* 797 F.2d at 958 (*quoting Waters v. Chaffin,* 684 F.2d 833, 836 (11th Cir.1982)).

**58.** *Busby, supra,* 931 F.2d at 774 (*quoting Egger v. Phillips,* 710 F.2d 292, 327 (7th Cir.) (Coffey, J., concurring in part), *cert. denied,* 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983)).

**59.** *See Waters, supra,* 684 F.2d at 839 & n. 12 (citations omitted) (italics supplied).

**60.** *McMullen v. Carson, supra,* 754 F.2d at 939–40 (*quoting Waters v. Chaffin, supra,* 684 F.2d at 839, n. 12).

strong interest in expressing his opinion on departmental malfeasance and whistleblowing,[61] such interests do not, standing alone, demonstrate the unlawfulness of Defendants' actions under qualified immunity principles.

The repeated holdings of the Eleventh Circuit on the wide deference due to quasi-military organizations such as a police department,[62] compel the conclusion that, under these facts, there is no clearly established, factually-defined, well-recognized constitutional right to hold a press conference as claimed by Plaintiffs. The Court holds that a reasonable public official on November 2, 1992 could not have known that denial of permission for Freeman to hold a press conference under the particular circumstances of this case violated his clearly established constitutional rights under the First Amendment. Accordingly, Defendants' motions for summary judgment based on qualified immunity in their individual capacity are **GRANTED**.[63]

*SUMMARY JUDGMENT ON THE MERITS*

## II. *RETALIATION CLAIMS*

■ To prevail because of a dismissal or disciplinary sanction in retaliation for the exercise of free speech, a plaintiff must establish that (1) the expression addressed a matter of public·concern; (2) the employee's First Amendment interests outweigh the interests of the employer in preserving the efficiency of government services; and (3) the employer's conduct was a motivating factor in the government's discharge or disciplinary decision. Once the plaintiff makes this showing, the burden of proof shifts to the defendant to prove by a preponderance of the evidence that it would have reached the same decision to terminate the plaintiff's employment or discipline him even in the absence of the· protected conduct.[64]

■ Where, as here, the employer denies discharging the public employee because of his speech, the law in this Circuit requires that the Court determine the threshold question [65] of whether the public employee's speech may be fairly characterized as constituting speech on a matter of public concern.[66] Plaintiffs bear the burden of proof on this issue.[67] A plaintiff must "state with precision and detail all the instances of speech that he considers to be protected." [68] The Court notes that because the Plaintiffs have failed adequately to identify the instances of speech alleged to have formed the basis for Defendants retaliations against Freeman for allegedly protected speech, the Court has conducted an in-depth analysis of the record and attempted to identify all potentially pro-

**61.** *Busby, supra,* 931 F.2d at 774; *Bryson v. City of Waycross,* 888 F.2d 1562, 1566 (11th Cir. 1989); *see Connick v. Myers,* 461 U.S. 138, 148, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983); *Goffer v. Marbury,* 956 F.2d 1045, 1049, 1050 (11th Cir.1992) (wrongdoing); *Morales v. Stierheim,* 848 F.2d 1145, 1149 (11th Cir.1988), *cert. denied sub nom. Leon v. Avino,* 489 U.S. 1013, 109 S.Ct. 1124, 103 L.Ed.2d 187 (1989) (same).

**62.** *See, e.g. Busby, supra,* 931 F.2d at 774–75; *McMullen v. Carson, supra,* 754 F.2d at 938 (*citing Kelley v. Johnson,* 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976)); *Eiland v. City of Montgomery, supra,* 797 F.2d at 958, 960; *Williams v. Board of Regents,* 629 F.2d 993, 1003 (5th Cir.1980), *cert. denied sub nom. Saye v. Williams,* 452 U.S. 926, 101 S.Ct. 3063, 69 L.Ed.2d 428 (1981); *Waters, supra,* 684 F.2d at 836, 839 & n. 12.

**63.** *Busby, supra,* 931 F.2d at 772; *Universal Amusement Co. v. Hofheinz,* 646 F.2d 996 (5th Cir.1981).

**64.** *Martinez v. City of Opa–Locka,* 971 F.2d 708, 712 (11th Cir.1992) (citation omitted); *Kurtz v. Vickrey,* 855 F.2d 723, 730–31, 731–32 (11th Cir. 1988) (*quoting Mt. Healthy City School District Board of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977)); *see Waters v. Chaffin,* 684 F.2d 833, 837 n. 9 (11th Cir.1982) (First Amendment implicated not just by retaliatory discharge, but also where a public employee is disciplined for his speech); *Goffer, supra,* 956 F.2d at 1049, n. 1 (First Amendment "protects against not only discharge but also any adverse employment action taken by the employer that is likely to chill the exercise of constitutionally protected speech"); *Busby, supra,* 931 F.2d 764 (retaliatory disciplining).

**65.** *Bryson, supra,* 888 F.2d at 1566; *see Schneider v. Indian River Community College Foundation, Inc.,* 875 F.2d 1537, 1542 (11th Cir.1989).

**66.** *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

**67.** *Morales, supra,* 848 F.2d at 1148, n. 4

**68.** *Kurtz, supra,* 855 F.2d at 730, n. 4.

tected speech or conduct that may have provoked Freeman's retaliatory penalization.[69]

The court must examine the content, form, and context of the employee's speech, as revealed by the whole record, to determine whether it addresses a matter of public concern.[70] If an employee's

> expression cannot be fairly considered as relating to any matter of political, social or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment.... [W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.[71]

As the Supreme Court stated in *Connick*, "[t]o presume that all matters within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case."[72]

The Eleventh Circuit has frequently applied the *Connick* public interest test.[73] The Court of Appeals has held that "a public employee may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run."[74] A court should consider the employee's efforts to communicate his concerns to the public, the content of the speech, and the employee's motivation in speaking.[75] While an employee does not sacrifice his First Amendment rights merely because he communicates in private with his employer rather than disseminating his message in public, the employee's attempt at public communication, though not dispositive, is still a relevant factor in the *Connick* public interest analysis.[76] This Circuit recognizes that the most important factor in analyzing whether speech addresses a matter of public concern is the content of the statement at issue.[77] Also highly emphasized "is whether the speaker is in pursuit of purely private interests."[78] The *Connick* public interest test is intensively "fact-bound," requiring case-by-case application.[79]

The Supreme Court, in *Connick, supra*, cited the following as speech that was a matter of public concern or import: charges that a governmental agency was not discharging its duties, and seeking to bring to light actual or potential wrongdoing or breach of public trust. The Court also noted that "the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs."[80]

In *Terrell v. University of Texas System Police*,[81] the Fifth Circuit, in a case remark-

---

**69.** See *Goffer v. Marbury*, 956 F.2d 1045, 1050 (11th Cir.1992) (cautioning against addressing all protected speech in a unitary or global fashion) and *Kurtz v. Vickrey*, 855 F.2d 723 (11th Cir. 1988) (district court failed to identify and separate protected speech).

**70.** *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987).

**71.** *Connick, supra*, 461 U.S. at 146–49, 103 S.Ct. at 1689–91.

**72.** *Id.* at 149, 103 S.Ct. at 1691.

**73.** See generally *Kurtz, supra*, 855 F.2d at 730–32 and *Eiland, supra*, 797 F.2d at 956–57, n. 4, for helpful discussions of the complex analytical processes and burdens of proof involved in First Amendment retaliatory discharge claims. *See also Kurtz, supra*, 855 F.2d at 734 (Fay, J., dissenting).

**74.** *Ferrara v. Mills*, 781 F.2d 1508, 1516 (11th Cir.1986).

**75.** *Deremo v. Watkins*, 939 F.2d 908, 910–911 (11th Cir.1991) (citations omitted).

**76.** *Id.* at 911, n. 3; *Rankin, supra*, 483 U.S. at 386, 107 S.Ct. at 2898.

**77.** See *Kurtz, supra*, 855 F.2d at 727–730.

**78.** *Goffer, supra*, 956 F.2d at 1050.

**79.** *Id.*

**80.** *Connick, supra*, 461 U.S. at 148–49, 103 S.Ct. at 1691.

**81.** 792 F.2d 1360 (5th Cir.1986).

ably on point, held that a police captain's secret diary was not speech addressing a matter of public concern. In *Terrell*, the Police Chief received an anonymous letter accompanied by photocopies from Captain Terrell's secret notepad diary. The diary addressed the Chief's policy of mandatory overtime; the need for supervisory training; and the need to conduct exit interviews with employees who resigned. The tone of the notepad diary reflected unfavorably on the police chief. A jury found that Captain Terrell's termination resulted from his exercise of protected speech. The Fifth Circuit held that "[b]ecause almost anything that occurs within a public agency *could* be of concern to the public, we do not focus on the inherent interest or importance of the matters discussed by the employee. Rather, our task is to decide whether the speech at issue in a particular case was made primarily in the plaintiff's role as a citizen or primarily in his role as an employee. In making this determination, the mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little moment." The Court found that the plaintiff had made no effort to communicate the contents of the notebook to the public, and that any suggestions contained in the diary were a "wholly intragovernmental concern at the time Terrell was fired" and therefore held that "Terrell was not terminated for speaking 'as a citizen on matters of public concern or for speak[ing] out as a citizen on a matter of general concern, *not tied to a personal employment dispute.*' " [82]

Plaintiffs have made much of the allegedly illegal hiring of members of the Chief Squad and the waste of public expenditure resulting from the lack of need for a special Chief Squad and the fact that the squad wastes the public fisc by not working full eight hour days and by taking three and four day weekends, and by sitting around their offices all day doing nothing. However, Angle's memorandum addresses none of these concerns.

Plaintiffs' description of the memorandum at issue as satire even goes too far: the memorandum did not satirize the Chief's Squad *per se,* but rather, ridiculed Angle's encounter with officers Brunson and Dennard. Angle typed the memorandum as a joke, intended for circulation only to Brunson or her husband. It was a purely private affair that attained a public dimension solely because of the mysterious posting of the memorandum on a bulletin board at the station. The most that can be said on matters of potential public concern is that the memorandum ridiculed Brunson and Dennard's duties by intimating that they had nothing better to do than spy on police officers eating tacos at a Taco Bell restaurant.

The key question, under these facts, is whether Angle spoke as a citizen on matters of public concern, or as an employee on matters only of personal interest. As in *Terrell, supra,* Angle's initial actions took place in a purely private setting, and only later attained a more "public" status. Angle's behavior in typing the memorandum was a prank, and one with potentially serious consequences at that. As in *Terrell, supra,* Angle made no effort to communicate the contents of the memorandum to the public. In any event, he composed the memorandum as a matter of personal interest and not as a citizen on a matter of public concern. Any assertion by Plaintiffs to the contrary "is, at best, facetious." [83] The Court holds that the memorandum at issue did not address a matter of public concern, and therefore, Plaintiffs have failed to satisfy the *Connick* public interest test. Accordingly, Defendants' motion for summary judgment on Angle's retaliatory discharge claim is **GRANTED.**

Plaintiff Freeman has made much of the retaliatory treatment he allegedly received as a result of his exercise of protected speech, and he has also focussed a great deal of energy on the chilling effect subsection 1/14 has had on his prospective speech. Freeman has also complained that Lieutenant Mike Roland, acting at the direction of Chief Johnson, ordered him not to criticize the Chief. Nevertheless, Freeman's claim in count five of the complaint is that Defendants

**82.** *Id.* at 1363 (*quoting Connick, supra,* 461 U.S. at 148 & n. 8, 103 S.Ct. at 1690 & n. 8) (italics & brackets in original).

**83.** *Bowers v. Hardwick,* 478 U.S. 186, 194, 106 S.Ct. 2841, 2846, 92 L.Ed.2d 140 (1986).

*sanctioned* him in retaliation for his exercise of free speech. Whatever the merits of the aforementioned allegations, Freeman's initial burden is and remains to establish that the expression which prompted the retaliatory treatment addressed a matter of public concern. In meeting this burden, Plaintiff must "state with precision and detail all the instances of speech that he considers to be protected."

Plaintiff Freeman (through his counsel) has failed to do so in this action, and the *Court's own in-depth analysis of the record* has uncovered only two instances of possible protected speech which might have addressed a matter of public concern: the March, 1991 letter presented to Mayor Dow, and the 1991 intradepartmental survey on Chief Johnson. In his deposition, Freeman cites both as expression on his part that prompted adverse action by Defendants. However, as noted earlier, neither the March, 1991 letter nor the survey are in the record. It is simply impossible for the Court to speculate on the content of these expressions, and on Freeman's involvement in these matters. Under these circumstances, Plaintiffs have failed to carry their burden of demonstrating that Freeman's speech was constitutionally protected, *i.e.* that it addressed a matter of public concern. Accordingly, Defendants' motion for summary judgment on count five of Plaintiffs' second amended complaint is **GRANTED.**

## III. DUE PROCESS CHALLENGE

■ The basis of Plaintiff Angle's due process claim is that "[d]espite [being] subpoena[d], Officer Brunson was directed upon orders of the Defendants not to appear at the Mobile County Personnel Board hearing." To prevail on a procedural due process claim, a plaintiff must establish 1) a constitutionally protected interest in life, liberty or property; 2) governmental deprivation of that interest; and 3) the constitutional inadequacy of procedures accompanying the deprivation. Failure to establish any of the above is fatal to a procedural due process claim.[84]

In *Zinermon v. Burch*,[85] the Supreme Court stated that a violation of federal procedural due process is not complete

when the deprivation occurs; it is not complete unless and until the State fails to provide [procedural] due process. Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the state provided, and whether it was·constitutionally adequate. This inquiry would examine the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivation provided by statute or tort law.[86]

Procedural due process "requires 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the [adverse] action and [to] afford them an opportunity to present their objections,'"[87] that is, "an opportunity to be heard 'at a meaningful time and in a meaningful manner.'"[88] Prior to his termination, a "tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story."[89] Additionally, "all the process that is due is provided by a pretermination opportunity to respond, coupled with post-termination administrative procedures as provided" by state law.[90] "Where an adequate

---

**84.** *Bank of Jackson County v. Cherry, supra,* 980 F.2d at 1366 (citation omitted).

**85.** 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990).

**86.** *Id.* at 123, 110 S.Ct. at 982.

**87.** *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 546, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985); *Dirt, Inc. v. Mobile County Commission,* 739 F.2d 1562, 1566 (11th Cir.1984) (*quoting Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950)).

**88.** *Parratt v. Taylor,* 451 U.S. 527, 540, 101 S.Ct. 1908, 1915, 68 L.Ed.2d 420 (1981), *overruled in part & on other grounds, Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (*quoting Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)); *Cherry v. Heckler,* 760 F.2d 1186, 1190 (11th Cir.1985) (*quoting Matthews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976)).

**89.** *Loudermill, supra,* 470 U.S. at 546, 105 S.Ct. at 1495.

**90.** *See id.* at 547–48, 105 S.Ct. at 1496.

state law remedy is provided to vindicate federal due process rights, there can be no denial of procedural due process, and thus no constitutional violation." [91]

■ Significantly, Angle alleges neither that the procedures by which he was deprived of his employment as a police officer were constitutionally inadequate, nor that the procedures provided by Mobile County in general are constitutionally inadequate. Nor does he argue that the Board or the Circuit Court of Mobile County violated his due process rights by allowing Defendants to order officer Brunson to ignore the subpoena to appear at Angle's Personnel Board hearing. Indeed, Angle claims one thing only: that an order by his employer directing a subpoenaed witness not to appear at his termination appeal before the Personnel Board deprived him of his property interest in employment as a police officer without procedural due process. He does not argue that Brunson's testimony was essential to presentation of his case, nor does he explain how, if at all, he was prejudiced by her failure to appear at the September 23, 1991 Personnel Board hearing. Finally, Angle did not appeal the Mobile County Circuit Court's Order affirming the Personnel Board's finding that his termination was justified.

Under these circumstances, Angle's procedural due process claim must fail. Specifically, Angle has failed to show the constitutional inadequacy of procedures accompanying his termination. Angle received a full hearing before the Personnel Board, and presented testimony through competent counsel. He had every opportunity to appeal the Personnel Board's decision to the Court of Civil Appeals, and the Alabama and United States Supreme Courts, but he did not do so. Furthermore, from what the Court can tell, Angle did not complain either to the Personnel Board or to the Circuit Court of Defendants' conduct in ordering officer Brunson to ignore the subpoena. Alabama provides a means of review by a state circuit court, and Angle has not argued that the prescribed procedures are unfair. Therefore, Angle has no federal claim.[92] As stated above, "[w]here an adequate state law remedy is provided to vindicate federal due process rights, there can be no denial of procedural due process, and thus no constitutional violation." [93] Accordingly, Defendants' motion for summary judgment on the procedural due process claim is **GRANTED.**

## IV. TORT OF OUTRAGE

■ Plaintiff Angle claims that Defendants committed the tort of outrage in that "[d]espite [being] subpoena[d], Officer Brunson was directed upon orders of the Defendants not to appear at the Mobile County Personnel Board hearing." The tort of outrage occurs when "one who by extreme or outrageous conduct intentionally or recklessly causes severe emotional distress to another." [94] The tort consists of four basic elements: 1) that the defendant knew or should have known that its conduct was likely to result in emotional outrage; 2) that the conduct was extreme and outrageous; 3) that the defendant's actions were the cause of the plaintiff's distress; and 4) that the emotional distress suffered by the plaintiff was "severe." [95] The plaintiff's burden of proving the existence of the tort is a heavy one.[96]

■ It is the province of the trial court to decide, in the first instance, whether a defendant's conduct is sufficiently outrageous or extreme as a matter of law.[97] Extreme con-

---

**91.** *McKinney v. Pate,* 985 F.2d 1502, 1514 (11th Cir.1993) (Tjoflat, C.J., specially concurring).

**92.** *See id.* at 1514–15 & n. 12; *see Parratt, supra,* 451 U.S. at 543, 101 S.Ct. at 1917.

**93.** *McKinney v. Pate, supra,* 985 F.2d at 1514.

**94.** *American Road Service v. Inmon,* 394 So.2d 361, 365 (Ala.1980).

**95.** *U.S.A. Oil, Inc. v. Smith,* 415 So.2d 1098, 1100 (Ala.Civ.App.), *cert. denied sub nom. Ex Parte Smith,* 415 So.2d 1102 (Ala.1982); *see also*

*Grimsley v. Guccione,* 703 F.Supp. 903, 907 (M.D.Ala.1988) (Thompson, C.J.). Section 46 of the Restatement (Second) of Torts, which the Alabama Supreme Court adapted in establishing the tort of outrage in *Inmon, supra,* also states that "if bodily harm to the [victim of extreme and outrageous conduct] results from it", the party responsible will be liable "for such bodily harm." Restatement (Second) of Torts § 46(1).

**96.** *Surrency v. Harbison,* 489 So.2d 1097, 1105 (Ala.1986).

**97.** *Logan v. Sears, Roebuck & Co.,* 466 So.2d 121, 123 (Ala.1985).

**1546**

duct must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." [98] Mere insults, indignities, threats, or annoyances are insufficient to give rise to the tort of outrage.[99] The emotional distress suffered, if any, must be so severe that no reasonable person could be expected to endure it.[100]

■ Although Defendants have totally failed to address the issue of the tort of outrage in their briefs, they have moved for summary judgment on this claim arising under Alabama law, over which the Court is exercising supplemental jurisdiction pursuant to 28 U.S.C. § 1367. Since the Court is empowered to decide as a matter of law whether the alleged conduct is sufficiently extreme and outrageous to constitute the tort of outrage, the Court will proceed to analyze the issue. · The question is whether an order by officer Rose Brunson's superiors that she ignore a subpoena to testify at Angle's Personnel Board hearing is "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." Although existing case law does not cover the precise facts in this action, the Court finds it manifest that the Defendants actions cannot, as a matter of law, amount to conduct sufficiently extreme and outrageous as to constitute the tort of outrage. In any event, the Court is without authority to expand the tort of outrage beyond its current parameters to cover a situation such as this.[101] Accordingly, Defendants' motion for summary judgment on Plaintiff Angle's claim that Defendants committed the tort of outrage is **GRANTED.**

## V. COUNT SIX/VAGUENESS & OVERBREADTH

■ In count six of Plaintiffs' third amended complaint, Freeman alleges that his superiors denied him permission to speak at a press conference after he submitted an itemized list of topics he wanted to address. Freeman thus attempted to clear the chain of command as provided for in subsection 1/14. Chief Johnson's affidavit and Freeman's May 6, 1993 affidavit are in conflict over the denial of permission for Freeman to speak. Therefore, there is a genuine issue as to a material fact on count six of Plaintiffs' third amended complaint. The Court will take up the issue of subsection 1/14's vagueness and overbreadth at trial.[102] Accordingly, Defendants' motion for summary judgment on count six of Plaintiffs' third amended complaint is **DENIED.**

Also before the Court is Defendants' motion to strike Plaintiff Freeman's May 6, 1993 affidavit. [Docs. 74–75]. Defendants argue that the affidavit contains allegations as to ultimate or conclusory facts and conclusions of law and fails to affirmatively show that the affiant is competent to testify to the matters stated therein. However, Freeman's affidavit is based upon personal knowledge and recounts admissible testimony as to what Freeman believes Deputy Chief Wilhelm told him in response to his itemized letter requesting permission to participate in a press conference. The affidavit also sets forth Freeman's understanding of what Deputy Chief Wilhelm meant when he said he had "discussed the matter with Chief Johnson and [holding the press conference] would not be a good idea." This is all that is required by Federal Rule of Civil Procedure 56(e).[103] Accordingly, Defendants' motion to strike

**98.** *Inmon, supra,* 394 So.2d at 365.

**99.** *Grimsley, supra,* 703 F.Supp. at 907.

**100.** *Inmon, supra,* 394 So.2d at 365.

**101.** *See, e.g.* Roberts & Cusimano, *Alabama Tort Law Handbook,* § 23.5 at 491, n. 57 (1990) & 1992 Supp. at 140 (collecting cases of unsuccessful outrage claims).

**102.** *See Harden v. Adams,* 760 F.2d 1158, 1166 (11th Cir.), *cert. denied sub nom. Grimmer v. Harden,* 474 U.S. 1007, 106 S.Ct. 530, 88

L.Ed.2d 462 (1985) ("strong policy reflected in the decisions of the Supreme Court and this Circuit against resolving complex First Amendment issues on a motion for summary judgment").

**103.** *See Echaide v. Confederation of Canada Life Insurance,* 459 F.2d 1377, 1381, n. 5 (5th Cir. 1972); *CMS Industries, Inc. v. L.P.S. International, Ltd.,* 643 F.2d 289, 295 (5th Cir. Unit B 1981). In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982), the Eleventh Circuit adopted as precedent all decisions of Unit B of the former Fifth Circuit.

Plaintiff Freeman's May 6, 1993 affidavit is **DENIED.**

To summarize: Defendants' joint motion for summary judgment on the merits is **GRANTED IN PART** as to counts one through five of Plaintiffs' second amended complaint, and **DENIED** as to count six of Plaintiffs' third amended complaint. Defendants' motions for summary judgment based on qualified immunity are **GRANTED** with respect to count six of Plaintiffs' third amended complaint.

### JUDGMENT

This matter having come before the Court on the motion for summary judgment filed by Defendants Michael Dow and Harold Johnson, and the Court having concluded that there is no genuine issue of material fact that would establish a jury question on the issue of liability of Defendants Michael Dow and Harold Johnson, it is hereby **ORDERED, ADJUDGED & DECREED** that the Plaintiff John Angle shall have and recover nothing against the Defendants Michael Dow and Harold Johnson, and that the Plaintiff John Angle's claims against Michael Dow and Harold Johnson, are due to be, and hereby are, **DISMISSED** with prejudice.

### APPENDIX I

#### INTRA–DEPARTMENTAL REPORT

TO: ALL INTERESTED PERSONS

FROM:

DATE: 06–08–91

RE: CHIEF'S SQUAD (PIMPS)

ON 06-07-91, SOME OF THE RANGER UNITS OBSERVED A BLACK MR 2 THAT APPEARED TO BE FOLLOWING THEM. WHEN THE RANGER UNITS DOUBLED BACK ON THE SUBJECTS, THEY HAD A VERY SURPRISED AND CAUGHT LOOK ABOUT THEIR FACES. ONE RANGER UNIT RAN THEIR TAG, HOWEVER HE RAN THE TAG WRONG THUS GIVING "PROBABLE CAUSE" FOR A TRAFFIC STOP TO INVESTIGATE AN "IMPROPER DISPLAY". DURING THE TRAFFIC STOP, POLICE OBTAINED THE IDENTITY OF THE BLACK FEMALE DRIVER. REGINA DENNARD DOB/09-19-69 SOC/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 ... ALSO DURING THE STOP, OFFICERS HEARD THE SOUND OF A HAND HELD RADIO. THE PASSENGER, A WHITE FEMALE LATER IDENTIFIED AS ROSE BRUNSON UNK/DOB, PUSHED A MOTOROLA RADIO UNDER THE PASSENGER'S SEAT. THE BRUNSON SUBJECT IS A WHITE FEMALE WITH AN ORIENTAL LOOK. SHE IS SHORT, HAS SHORT STRAIGHT HAIR AND A "BEAUTY MARK" ON HER RIGHT CHEEK. SHE HAS A VERY NOTICEABLE ILL SHADE OF A PALE COMPLEXION.

THESE SUBJECTS WERE CAUGHT YET A SECOND TIME AT THE REAR OF THE TACO BELL ON GOVERNMENT STREET APPARENTLY WATCHING TO SEE IF THE RANGER UNITS ATE THEIR TACOS IN A TIMELY MANNER.

THE BRUNSON SUBJECT IS THE WIFE AND BOSS OF A PHILLIP "NADINE" BRUNSON OF SATSUMA CITY POLICE DEPARTMENT.

BOTH SUBJECTS WERE OCCUPYING THE MR 2 THAT SGT. MCLEAN USUALLY DRIVES DISPLAYING AL/91/2BP 4697....

### APPENDIX II

Clyde Freeman, President
Mobile County Law
Enforcement Association
Post Office Box 1032
Mobile, Alabama 36633

October 27, 1992

Assistant Chief Ronald Wilheim

2604 Government Boulevard

Mobile, Alabama 36606

Dear Chief Wilheim:

In response to recent events, various members of the Mobile area news media have asked me to attend a press conference for the purpose of addressing certain issues, problems and/or past incidences of behavior within the Mobile Police Department. The media has asked me to speak as President of the Mobile County Law Enforcement Associ-

ation and not as an individual officer within the department.

Many of the issues, problems and/or past incidences of behavior I would like to address are products of my own observations and others have been brought to my attention by concerned members of the department.

In relaying the referenced issues, problems and/or past incidences of behavior, the men often ask me to please make these issues, problems and/or past incidences of behavior known to the city's administration as well as the public, because the men feel that these issues, problems and/or past incidences of behavior affect the health, safety and welfare of the individual citizens of the City of Mobile.

In addressing the referenced issues, problems and/or past incidences of behavior, I feel sure that there will be some criticism of the mayor and police chief involved. I am familiar with Procedural General Order # 55 Subsection 1/14 of the Mobile Police Department, and I am not sure whether or not this criticism will impair the operation of the Mobile Police Department. Therefore, in compliance with Procedural General Order # 55 Subsection 1/14, I am formally requesting permission to address the following issues, problems and/or past incidences of behavior:

1. That the Chief of Police has had four new city furnished vehicles in a two year period of time;

2. Whether or not the money which is being spent on new police vehicles for the Chief of Police could be better spent on other equipment which the department desperately needs;

3. That the Chief of Police has wrecked his city furnished vehicles on more than one occasion and was suspected to be under the influence of alcohol on at least one of these occasions;

4. The unusually high turnover rate within the Mobile Police Department and any connection with the Chief of Police;

5. That the western section of the City of Mobile which comprises seventy-five (75%) percent of the area of the City of Mobile, is protected by only twenty (20%) percent of the officers assigned to the patrol division, thus sometimes leaving priority calls unanswered for periods of up to one hour. Additionally, I would like to say that this disproportionate assignment of manpower also causes officers to have to respond to priority calls without the assistance of backup, thus endangering the life of the officer as well as the general public;

6. That the department has misrepresented crime statistics within the City of Mobile to the public;

7. That the Mayor of the City of Mobile made campaign promises to improve the morale within the Mobile Police Department and his actions have effectively caused morale to plummet to an all time low. Additionally, I would like to address the effect that morale has had on the effectiveness of the department;

8. That the Chief of Police violated the civil rights of a prisoner during an interrogation. This violation resulted in a federal investigation wherein a Mobile Police Department patrolman was questioned about the Chief's conduct and the officer was instructed by the Chief of Police to lie to FBI agents who were conducting the investigation.

9. That if the "Chief Squad" had been a legitimate and effective police operation, it's existence would not have been kept a secret from the officers within the Mobile Police Department. Additionally, I would like to say that if the men within the department had been properly informed, the incident involving John Angle's memorandum would not have taken place. Nonetheless, I feel that because of the way the "Chief Squad" came into existence and because of the way the squad was being operated, the First Amendment gave John Angle an absolute right to publically criticize the squad.

The media has scheduled a news conference for Tuesday, November 3, 1992, at 6:00 p.m. Please review my concerns and inform me whether I have permission to attend this

news conference and express my concerns by Monday, November 2, 1992, at 2:00 p.m.

Respectfully submitted,
/s/ Clyde H. Freeman
CLYDE H. FREEMAN