**Debbie J. WARD, Plaintiff,**

v.

**PAPA'S PIZZA TO GO, INC., Defendant.**

Civ. A. No. 694–041.

United States District Court,
S.D. Georgia,
Statesboro Division.

Jan. 10, 1995.

Elizabeth F. Bunce, Franklin, Taulbee, Rushing & Bunce, Statesboro, GA, for plaintiff.

David Timothy Whitworth, Donna Linn Crossland, Fendig, McLemore, Taylor & Whitworth, Brunswick, GA, David N. Levine, Atlanta, GA, for defendant.

## *ORDER*

EDENFIELD, Chief Judge.

Plaintiff brought suit seeking compensatory and punitive damages for disability-based employment discrimination and intentional infliction of emotional distress. Defendant moves for partial summary judgment on the issues of tort liability, punitive damages, and front pay awards. For reasons discussed below, Defendant's motion is **GRANTED**.

### I. Facts

The essential facts of this case are as follows; the Court notes material disputes.

Defendant opened a pizza establishment in Metter, Georgia in January of 1992, and was greeted by over a hundred employment applications from local residents. Among the applicants was Plaintiff, who visited the store just before its opening and submitted an application in person to Mike Oglesby, district supervisor of the Defendant company.

Mr. Oglesby does not remember the substance of his encounter with Plaintiff, but does know that he did not extend an offer of employment to her; he left those decisions to the local manager of that particular store. Plaintiff remembers a fifteen minute conversation with Oglesby, during which she told him that she had epilepsy. Oglesby "showed concern," and asked if the condition had affected her prior jobs. Plaintiff responded that it had not significantly affected her past employment. Oglesby then allegedly said that he would not hire Plaintiff at that time, preferring to wait and see if she could get her seizures "under control." Oglesby promised to "keep [her] in mind" for a job passing out flyers.

In response to a newspaper advertisement, Plaintiff again applied to Defendant's Metter store in October, 1992. She submitted an application form to Wendy Sanders, the store manager, and reviewed with Ms. Sanders her previous work experience in "fast food" establishments. She also told Sanders that she had epilepsy. Ms. Sanders apparently responded that Plaintiff's epilepsy "shouldn't be a problem," or words to that effect,[1] and asked her to return at a later time.[2] Plaintiff did so, and was informed that in the interim another person had been hired to fill the available position.

Plaintiff testified that she applied a third time in November, 1992, again in response to a newspaper advertisement. In her Equal Employment Opportunity Commission ("EEOC") complaint, however, she stated that she met with Sanders in November to follow up on her initial interview in October. Regardless of the correct sequence of events, she did not submit another written application, but met with Sanders at the store. Ms. Sanders does not recall this third meeting with Plaintiff, stating that after their second

October meeting, Sanders never saw Plaintiff again and discarded her application. Plaintiff claims that during the November meeting Sanders raised the issue of Plaintiff's epileptic seizures and concerns about Plaintiff cutting herself with automatic slicers used in the store. Sanders then allegedly "flat out said that she was not going to hire [Plaintiff] because of [her] seizures." D. Ward Dep. at 57. Plaintiff then claims that she offered to sign a written release of any claims arising from job-related injuries caused by seizures, but that Sanders declined. Plaintiff then left.

On December 1, 1992, Plaintiff filed a complaint with the EEOC, claiming that she "was refused employment [three] times because of my seizure disorder." *See* Def.Mtn. for Ptl.Sum.Judg., Exh. C. In November, 1993, Plaintiff's counsel requested and received a Notice of Right to Sue on Plaintiff's behalf. *Id.* This action was filed on February 9, 1994, seeking damages for violations of the Americans With Disabilities Act ("ADA") and the intentional infliction of emotional distress. On September 6, 1994, Defendant moved for partial summary judgment on Plaintiff's tort claim and various damages issues.

## II. Summary Judgment Analysis

The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citation omitted). Analysis ends "where there is no genuine issue of material fact and where the moving party is entitled to judgment as a matter of law." *Great Lakes Dredge & Dock Co. v. Miller*, 957 F.2d 1575, 1578 (11th Cir.1992); *Real Estate Fin. v. Resolution Trust Corp.*, 950 F.2d 1540,

1. Sanders testified by deposition that she informed Plaintiff that the epilepsy was a concern, but that it would not weigh against her employment opportunities with Defendant's store. Sanders stated that she explained to Plaintiff that epilepsy might be a problem because employees needed to use automated slicers and other potentially dangerous equipment, but that Plaintiff would be accommodated if possible. Plaintiff does not recall these statements being made at this meeting, but does roughly recall them from a

later discussion that Sanders does not remember. Although the Court makes no finding on this point, it appears that these statements were indeed made by Sanders, but one or both parties misremember the circumstances.

2. There is some confusion over whether Sanders asked Plaintiff to return that same afternoon, the coming Thursday, or "in a few days."

1543 (11th Cir.1992) (both citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). Thus, summary judgment is appropriate where the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552; *Tidmore Oil Co. v. BP Oil Co.*, 932 F.2d 1384, 1387–88 (11th Cir.), *cert. denied*, 502 U.S. 925, 112 S.Ct. 339, 116 L.Ed.2d 279 (1991).

■■■■ "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. *See Goree v. Winnebago Indus., Inc.*, 958 F.2d 1537, 1539 (11th Cir.1992). If the movant successfully discharges this initial burden, it shifts to the nonmovant, who must establish, by going beyond the pleadings, that there is a genuine issue as to facts material to the nonmovant's case. *Thompson v. Metropolitan Multi-List, Inc.*, 934 F.2d 1566, 1583 n. 16 (11th Cir.1991). *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir.1991), *cert. denied*, 502 U.S. 1048, 112 S.Ct. 913, 116 L.Ed.2d 813 (1992).

■■■■ The nonmovant "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *United States v. Gilbert*, 920 F.2d 878, 882 (11th Cir.1991). If the nonmovant's response to the summary judgment motion consists of nothing more than conclusory allegations, then the Court must enter summary judgment in the movant's favor. *Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir.1989).

■■■■ In assessing whether the movant is entitled to summary judgment, the district court must construe the evidence and all reasonable factual inferences arising from it in a manner most favorable to the nonmovant. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir.1992). The Court must avoid weighing conflicting evidence, *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. at 2513–14, or making credibility determinations. *Id.* at 255, 106 S.Ct. at 2513–14; *McKenzie v. Davenport–Harris Funeral Home*, 834 F.2d 930, 934 (11th Cir.1987). A mere "scintilla" of evidence supporting the nonmovant's position, however, will not suffice. *E.g., Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.1990). Nevertheless, where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a general issue of material fact, then the court should refuse to grant summary judgment." *Barfield v. Brierton*, 883 F.2d 923, 933–34 (11th Cir.1989) (citation omitted).

## III. Intentional Infliction of Emotional Distress

Defendant first seeks summary judgment on Plaintiff's pendent state law claim of intentional infliction of emotional distress. *See* 28 U.S.C. § 1367 (on supplemental jurisdiction). A court appropriately screens the evidence supporting such a claim to determine if it warrants submission to a trier of fact. *See Moses v. Prudential Ins. Co. of Amer.*, 187 Ga.App. 222, 226, 369 S.E.2d 541 (1988). In the instant case, even viewing all of Plaintiff's allegations as true, i.e., she applied to Defendant three times; was rejected three times; and was explicitly told that she was being denied employment because of her disability, her claim still fails as a matter of law.

### A. Emotional Distress Basics

■■■■ To recover for the intentional infliction of emotional distress, "the defendant's actions must have been so terrifying or insulting as naturally to humiliate, embarrass or frighten the plaintiff." *Id.* at 224–25, 369 S.E.2d 541; *Sweeney v. Athens Regional Medical Center*, 709 F.Supp. 1563, 1579 (M.D.Ga.1989). Georgia courts follow a three prong inquiry. Plaintiffs must show:

(1) that the defendant's behavior was willful and wanton and intentionally directed to harming the plaintiff; (2) that the actions of the defendant were such as would

naturally humiliate, embarrass, frighten, or outrage the plaintiff; and (3) that the conduct caused mental suffering or wounded feelings or emotional upset or distress to the plaintiff.

*Coleman v. Housing Auth.*, 191 Ga.App. 166, 170, 381 S.E.2d 303 (1989). *See also Yarbray v. Southern Bell Tel. & Tel. Co.*, 197 Ga.App. 846, 399 S.E.2d 718 (1990), *aff'd in part, rev'd in part*, 261 Ga. 703, 409 S.E.2d 835 (1991). The first prong of this test, the state of mind inquiry, is met when the defendant acts in "reckless disregard of the rights of others." *Moses*, 187 Ga.App. at 224, 369 S.E.2d 541. The second prong, the "outrageousness" inquiry, is resolved by reviewing the totality of the circumstances. *Id.* at 225, 369 S.E.2d 541. To rise to the required level of outrageousness, the acts complained of "must be sufficiently egregious or outrageous to result in severe fright, humiliation, embarrassment, or outrage which no reasonable person can be expected to endure." *Kornegay v. Mundy*, 190 Ga.App. 433, 434, 379 S.E.2d 14 (1989). *See also Moses*, 187 Ga.App. at 225–26, 369 S.E.2d 541. The third prong of the test is the severity requirement: In order to recover, the plaintiff must show that "the distress [was] reasonable and justified under the circumstances, ... there is no liability where the plaintiff has suffered exaggerated and unreasonable emotional distress, unless it results from a peculiar susceptibility to such distress of which the actor has knowledge." *Moses*, 187 Ga.App. at 226, 369 S.E.2d 541 (quoting Restatement (Second) of Torts, § 46(1) cmt. j).

■■■ Liability for "intentional infliction of emotional distress does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Jenkins v. General Hospitals of Humana, Inc.*, 196 Ga.App. 150, 152, 395 S.E.2d 396 (1990). Mere tasteless and rude social conduct is not actionable, *Kornegay*, 190 Ga.App. at 434, 379 S.E.2d 14, although "wilfully and wantonly caused emotional upset to the plaintiff through the use of abusive or obscene language" might be. *Tuggle v. Wilson*, 248 Ga. 335, 337, 282 S.E.2d 110 (1981). In the employment context, courts must be careful in making initial determinations of outrageousness. "[T]he existence of a special relationship in which one person has control over another, as in the employer-employee relationship, may produce a character of outrageousness that otherwise might not exist." *Coleman*, 191 Ga.App. at 169, 381 S.E.2d 303 (citation omitted). *See also Brown v. Manning, et al.*, 764 F.Supp. 183, 187 (M.D.Ga. 1991) (citing special relationship between insurance claim adjuster and claimant and denying summary judgment for claim adjuster).

## B. Defendant's Conduct

■■■ Even with that caveat in mind, the Court is still forced to conclude that a reasonable jury could not find that the conduct here alleged by Plaintiff is so egregious as to be tortious. *See Richardson v. Hennly*, 209 Ga.App. 868, 872, 434 S.E.2d 772 (1993), *rev'd on other grounds*, 264 Ga. 355, 444 S.E.2d 317 (1994) (distinguishing between claims not rising to requisite level of severity and those on which reasonable triers of fact could differ). An initial obstacle to recovery is the complete lack of evidence that Ms. Sanders sought intentionally to harm the Plaintiff or acted in any way evincing a "reckless or wanton disregard of consequences." *Hamilton v. Powell, et al.*, 252 Ga. 149, 150, 311 S.E.2d 818 (1984). *See also Anderson v. Chatham*, 190 Ga.App. 559, 566, 379 S.E.2d 793 (1989) (focusing on "wilful and wanton" inquiry). It would be beyond credibility for Plaintiff to argue that extreme, that is, legally cognizable, emotional distress is the natural result of a failed application for employment, even if the applicant does not like the employer's reasons. The Eleventh Circuit has even held that discharge from an established position for improper reasons "does not constitute the egregious kind of conduct on which a claim of intentional infliction of emotional distress can be based." *Beck v. Interstate Brands Corp.*, 953 F.2d 1275, 1276 (11th Cir.1992) (citing *Suber v. Bulloch Cty. Bd. of Educ.*, 722 F.Supp. 736, 744 (S.D.Ga. 1989)). "Improper reasons" include discriminatory ones. *See Henrickson v. Pain Ctrl. & Rehab. Inst.*, 205 Ga.App. 843, 845, 424 S.E.2d 27 (1992), *rev'd on other grounds*, 263 Ga. 331, 434 S.E.2d 51 (1993) (in case regarding claim of disability-based employment discrimination, court holds that demotion or dis-

charge, "for whatever reason, without more, gives rise to no claim for the intentional infliction of emotional distress") (citing *Borden v. Johnson*, 196 Ga.App. 288, 290–91, 395 S.E.2d 628 (1990)).

Being denied a desired position is indeed a blow to one's dignity and self-esteem, and the emotional slight is surely magnified if suspected of growing from illicit motives. Even so, such emotional duress falls within that class of life's vagaries for which the law gives no comfort; all persons occasionally suffer such wounds, and the tort of intentional infliction of mental distress was never intended to assuage them. Applying for a position more than once and being denied that position more than once, even assuming that the employer voiced reservations concerning Plaintiff's medical problems, does not constitute the "extreme and outrageous conduct" that is a "prerequisite to liability." *Moses*, 187 Ga.App. at 224, 369 S.E.2d 541. Finally, although there is some evidence that the rejection exacerbated troubles in Plaintiff's personal life, it cannot be said that denial of Plaintiff's job application was the cause, foreseeable or otherwise, of her emotional straits.

A search of the record uncovers at most an indiscretion—an indiscretion possibly actionable under the ADA, but not one constituting the shameful conduct required to commit the independent tort of intentionally, wantonly, inflicting emotional harm so significant as to warrant legal relief. If perceived discrimination, *per se*, were enough to satisfy the requirements of this common law tort, such claims would become a permanent appendage to employment discrimination actions. They were never intended as such, but only to punish for the emotional consequences of overwhelmingly appalling conduct. The law is not a poultice for every social bruise. As Justice Cardozo said, in modern society "[t]he timorous may stay at home." *Murphy v. Steeplechase Amusement Co.*, 250 N.Y. 479, 166 N.E. 173 (1929) (Cardozo, J.) (discussing assumption of risk). *Cf.* Restatement (Second), § 46(1) cmt. d.

### C. Useful Comparisons

Conduct more serious than that alleged here is not actionable for emotional distress.

For example, in *Kornegay v. Mundy*, 190 Ga.App. 433, 379 S.E.2d 14 (1989), the plaintiff, a bank manager, claimed that the defendant, the bank's public relations officer, had intentionally caused her emotional distress. To determine whether the defendant's conduct was sufficiently outrageous to be actionable, the court of appeals examined those allegations that were supported by the record: that the defendant commented about the plaintiff's hair coloring and age, paced behind the teller lines, frequently interrupted the plaintiff while she was dealing with customer problems, intentionally interfered with bank teller performance, stated that the plaintiff was responsible for getting another employee fired and that no woman was capable of managing the plaintiff's branch, allowed nonowners access to safety deposit boxes in her branch and destroyed safety deposit signature cards, authorized loans and conducted bank business in contravention of bank rules, and swept objects off the plaintiff's desk while she was on the phone. *Id.* at 433–34, 379 S.E.2d 14. The Georgia Court of Appeals held that these incidents, "whether considered individually or collectively, do not, as a matter of law, rise to the requisite level of egregious or outrageous behavior." *Id.* at 434, 379 S.E.2d 14.

Other cases are instructive, like *Cooler v. Baker*, 204 Ga.App. 787, 788–89, 420 S.E.2d 649 (1992), in which continuous workplace harassment of plaintiff by her superior's son-in-law (he regularly greeted her with "hi, wench, how you doing?"), was held to not constitute the intentional infliction of emotional distress, and the *Moses* case, in which death threats by the plaintiff's ex-supervisor were also held insufficient as a matter of law. *See* 187 Ga.App. at 223, 226, 369 S.E.2d 541.

A refreshingly genuine example of outrageous conduct reasonably causing severe emotional pain is presented in *Brown v. Manning*, 764 F.Supp. 183 (M.D.Ga.1991). In that case a car insurance claimant, Brown, applied to his adjuster for reimbursement following an automobile collision. After Brown disagreed with the adjuster over the estimate, the adjuster observed: "That's what's wrong with you niggers now, you don't follow orders." *Id.* at 185. In a later

conversation, the adjuster informed the claimant that he didn't "give a damn about [the] car" and recommended that Brown perform various colorful sexual acts for the adjuster. *Id.* Finally, claimant received two telephone calls at home the next day. In the first, an unidentified man told the Brown's wife that the Ku Klux Klan would kill him if the insurance adjuster were fired for his improprieties, and in the second, told Brown: "Yes you nigger, we're going to blow your fucking brains out. We love stringing niggers up there on trees.... If you don't drop the charges against [the adjuster], ... we're going to kill your mother fucking ass, you hear me nigger, do you hear me nigger?" *Id.* at 185–86.

Although Brown, undeterred, cheerfully pointed out to the second caller that he had an Uzi submachinegun and would be on his front porch awaiting their arrival, the Court found this situation a clear example of the willful and wanton infliction of severe emotional distress. *Id.* at 187–88. This Court agrees, and the *Brown* case nicely illustrates the type of behavior for which this tort is rightfully reserved. The instant case, however, does not.

Defendant's motion for summary judgment on Plaintiff's claim of intentional infliction of emotional distress is granted.

### IV. Punitive Damage Awards

 Defendant also moves for summary judgment on the issue of punitive damages. It is not entirely clear from Defendant's motion whether Defendant targets only Plaintiff's state law tort claim, or the ADA claim as well. Because the Court granted summary judgment on the tort claim, it need not address the issue of damages on that claim. As for the ADA claim, punitive damages are assessed according to federal civil rights provisions, 42 U.S.C. § 1981, et seq.: to recover punitives, the plaintiff must show that a defendant (1) engaged in intentional discrimination, and (2) did it "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." *Id.* at 1981a(b)(1).

*See also* 42 U.S.C. § 12117(a) (Title VII remedies available to ADA plaintiffs).

For Defendant to prevail on this portion of its motion, there must be no genuine issues of material fact on the question of whether Defendant's employee, Ms. Sanders, intentionally discriminated and did so maliciously or recklessly. The former determination is indeed an important issue of fact that the Court cannot confidently resolve on the paper record. Ms. Sanders' intent in rejecting Plaintiff's application should be left for a jury to decide. *See Batey v. Stone,* 24 F.3d 1330, 1336 (11th Cir.1994) (holding that in the context of employment discrimination actions, "the granting of summary judgment ..., 'which usually necessarily involves examining motive and intent, ... is especially questionable.'") (quoting *Hayden v. First Nat'l Bank,* 595 F.2d 994, 997 (5th Cir.1979)).[3] *See also United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 716 (1983) ("[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes").

Sanders' alleged malice and recklessness is another matter. An award of punitive damages would require

[C]ircumstances of aggravation or outrage, such as spite or 'malice,' or fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called wilful or wanton....

*Colonial Pipeline Co. v. Brown,* 258 Ga. 115, 121–22, 365 S.E.2d 827, *appeal dismissed,* 488 U.S. 805, 109 S.Ct. 36, 102 L.Ed.2d 15 (1988) (quoting W.L. Prosser & W.P. Keeton, The Law of Torts, 8–11 (6th ed. 1976)). As noted in the Court's discussion, supra, of Plaintiff's tort claim, the record, viewed most favorably for the Plaintiff and including exhibits, pleadings, and depositions, is devoid of evidence showing malice, recklessness, or anything beyond potentially bad judgment. In her response to Defendant's motion for summary judgment, Plaintiff presents no indication—much less evidence—of the required pernicious intent, and attempts to jus-

---

**3.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

tify punitive damages by arguing that denying Plaintiff's employment application "was clearly conduct in contravention of a federally protected right about which the Defendant was aware." Resp. at 7. That offering is patently insufficient. Having failed to provide a modicum of concrete support for her position, the Court holds that a reasonable trier of fact could not find punitive damages appropriate in this instance. *See Liberty Lobby, Inc.*, 477 U.S. at 257, 106 S.Ct. at 2514–15; *Peppers*, 887 F.2d at 1498.

Defendant's motion for summary judgment on the issue of punitive damages is granted as to both of Plaintiff's claims.

### V. Front Pay

▮▮▮ Remedies under the ADA parallel those available for Title VII suits, and courts generally allow awards of "front pay" in the latter cases. *See, e.g., Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1528 (11th Cir.1991) ("In addition to back pay, prevailing Title VII plaintiffs are presumptively entitled to either reinstatement or front pay."); *James v. Stockham Valves*, 559 F.2d 310, 358 (5th Cir.1977), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978) (allowing front pay award). Such awards are normally intended to (1) reimburse employees for discriminatory discharge or denial of promotion where the employees must wait for some period after trial before reinstatement or promotion; or (2) compensate an employee who cannot return to his previous position due to lingering hostility. *See, e.g., Goldstein v. Manhattan Industries*, 758 F.2d 1435, 1449 (11th Cir.), *cert. denied*, 474 U.S. 1005, 106 S.Ct. 525, 88 L.Ed.2d 457 (1985). These awards are given when necessary "to effectuate fully the 'make whole' purposes of [federal anti-discrimination laws]," *Shore v. Federal Express Corp.*, 777 F.2d 1155, 1159 (6th Cir.1985) (cited with approval in *United States v. Burke*, 504 U.S. 229, 239 n. 9, 112 S.Ct. 1867, 1873 n. 9, 119 L.Ed.2d 34 (1992)), that is, when back pay does not fully redress a plaintiff's injuries, and reinstatement is not possible. The latter is an important precondition: "Front pay remains a special remedy, *warranted only by egregious circumstances*.... in many cases the remedy of reinstatement will continue to suffice despite

the presence of [factors supporting a front pay award]." *Lewis v. Federal Prison Industries*, 953 F.2d 1277, 1281 (11th Cir.1992) (emphasis added).

The Fifth Circuit describes "front pay" awards thus:

In 'front pay' relief, a monetary award is calculated to terminate on the date a victim of discrimination attains an opportunity to move to his 'rightful place' rather than on the date the order granting relief is entered.

*Id.* See also *E.E.O.C. v. Enterprise Ass'n Steamfitters*, 542 F.2d 579, 590–91 (2d Cir. 1976), *cert. denied*, 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977) ("It is the date of actual remedying of discrimination, rather than the date of the district court's order, which should govern."). Plaintiff in the instant case seeks front pay to compensate for the difference between her current wage at Subway, Inc., and what she would now be earning had she (1) been hired by Defendant two years ago, and (2) still held that position.

▮▮▮ An initial problem is that in her Complaint Plaintiff demands various kinds of monetary relief, but not an order forcing Defendant to hire her. "Front pay" awards are normally "equal to the estimated present value of lost earnings that are reasonably likely to occur between the date of judgment and the time when the employee can assume his new position." *Patterson v. American Tobacco Co.*, 535 F.2d 257, 269 (4th Cir.), *cert. denied*, 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976) (cited with approval in *James*, 559 F.2d at 358). That is, there is usually some definable future terminating point making an award calculable by the trier of fact. In this case, there is no such point. Plaintiff is not awaiting reinstatement to a specific position or promotion to an improperly denied one, making use of this method problematic. *Cf. Stockett v. Tolin*, 791 F.Supp. 1536, 1554 (S.D.Fla.1992) (in case in which prevailing plaintiff could not return to previous position or industry, court grants front pay but limits award to one year from date of judgment, "a reasonable time in which Plaintiff could have obtained comparable employment"). Unlike at least one other court, this Court declines to allow computa-

tion of an award spanning the rest of Plaintiff's working life. *See Shore v. Federal Express Corp.*, 1986 WL 25448 (W.D.Tenn.) (calculating front pay award as difference between salary at current position and desired position through age 65).

■ The Court is aware, however, that front pay "does not lend itself to a per se rule," *Davis v. Combustion Engineering*, 742 F.2d 916, 922–23 (6th Cir.1984), and its calculation may be as flexible as it use. If Plaintiff prevailed, the Court could, conceivably, exercise continuing jurisdiction over this case and make periodic backpay awards until Plaintiff attained the wage level she "would have" been making had she been employed by Defendant. *Cf. Patterson*, 535 F.2d at 269. This accounting, however, is hopelessly speculative. Plaintiff cannot show that she would not have voluntarily left Defendant's employment or been discharged over the past two years, and so cannot show that she would have received a raise during that period. Further, if employed by Defendant, Plaintiff would have worked only in a part-time capacity—a mode covering a wide range of weekly hours.

Further, the record reveals that Plaintiff has held no fewer than sixteen jobs between 1973 and 1992, most of them for a month or less. *See* D. Ward Dep. at 11, et seq. From some she left voluntarily, others involuntarily. There is notably little reason for concluding that Plaintiff would have stayed with Defendant for two years or however long was required to secure a raise. Also, for most of her employment history she has worked at minimum wage—the wage she currently earns and has earned since at least August, 1993.

Should Plaintiff prevail in this suit, the Court could never accurately assess when Plaintiff had reached her heretofore denied "rightful place" in the employment market for purposes of delimiting a "front pay" award: in sum, she never worked for Defendant, and so could not return to a previously designated position and salary; had Defendant hired her, she would have worked widely varying hours between then and now, thus making her exact "position" difficult to define; she has rarely ever earned more than Defendant would have paid her over the past two years; and she has never even held a food service position for more than one year. *See id.* at 13 (Plaintiff employed by Pizza Hut at minimum wage "for about a year"). *See Shore*, 777 F.2d at 1159–60 (noting difficulty of calculating "front pay" awards and their inherently "speculative nature").

Plaintiff's "rightful place" appears to be roughly the position she now holds and the wage she now earns. It is the position and salary she has enjoyed for most of her adult life. If it is not, no one can safely formulate the appropriate alternative. The Court will not allow a jury to consider an award of front pay in this case, a prospect brimming with "potential for windfall." *Duke v. Uniroyal, Inc.*, 928 F.2d 1413, 1424 (4th Cir.), *cert. denied*, 502 U.S. 963, 112 S.Ct. 429, 116 L.Ed.2d 449 (1991) (discussing front pay awards).

## VI. Conclusion

Because the record contains no evidence supporting either a state law claim for intentional infliction of emotional distress or an award of punitive damages under state or federal law, Defendant's motion for summary judgment on those issues is GRANTED. Because an accurate calculation of 'front pay' would be impossible and prone to misuse should Plaintiff prevail at trial, Defendant's motion for summary judgment on that issue is GRANTED as well.

**SO ORDERED.**