**Jayson L. WILSON, Plaintiff,**

v.

**GAYFERS MONTGOMERY FAIR CO., Ron Parrish and Sue Groce, Defendants.**

**Civil Action No. 95–D–1583–N.**

United States District Court, M.D. Alabama, Northern Division.

Oct. 8, 1996.

**1418**

Robert J. Varley, Montgomery, AL, for plaintiff.

Joseph T. Carpenter, Nathan C. Prater, Montgomery, AL, for defendants.

## MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

Before the court is defendants'[1] motion for summary judgment filed July 12, 1996, and brief in support thereof.[2] Plaintiff, Jayson Wilson, filed his brief in opposition to summary judgment on August 27, 1996. Defendants filed a response thereto on September 6, 1996. After careful consideration of the arguments of counsel, the relevant case law, and the record as a whole, the court finds that the defendants' motion is due to be granted in part and denied in part.

### JURISDICTION AND VENUE

Jurisdiction is proper pursuant to 28 U.S.C. § 1331 because plaintiff alleges violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.[3] Plaintiff also brings state law claims arising from the same transaction and occurrence as the alleged federal deprivation; therefore, the court may assert supplemental jurisdiction over plaintiff's state law claim. See 28 U.S.C. § 1367(a).[4] Personal jurisdiction and venue are uncontested.

1. Defendants are Gayfers Montgomery Fair Co., Ron Parrish, and Sue Groce.

2. Defendants filed an amended brief on July 31, 1996, adding citations to deposition page numbers.

3. Section 1331 provides, "[t]he district courts shall have original jurisdiction of all civil actions arising under the ... laws ... of the United States." 28 U.S.C. § 1331.

### SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *see also Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir.1989).

4. Pursuant to § 1367,

> ... in any civil action of which the district courts have original jurisdiction, the district court shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a).

The party seeking summary judgment has the initial burden of informing the court of the basis for the motion and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions in the file, together with affidavits, if any,'" that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53. Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *see also* Fed.R.Civ.P. 56(e).

In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.P. 56(c); *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356; *see also Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11.

### FINDINGS OF FACT

Plaintiff, Jayson Wilson ("Wilson"), was hired in 1983 by Defendant Gayfers Montgomery Fair Co. ("Gayfers") to work as an associate in the stockroom in the Columbus, Georgia, store. Wilson Dep. at 14–15. Wilson became a manager trainee in 1987, and in 1989, he was transferred to the Eastdale

Mall store in Montgomery, Alabama, to work as department manager in the men's department. *Id.* at 16–19. Wilson suffers from an undiagnosed hearing loss, and began wearing a hearing aid for one ear in 1988 and hearing aids for both ears in 1990. *Id.* at 27–37.

Wilson consistently received good evaluations while he was working at the Columbus store and was never disciplined for any reason. *Id.* at 44–47. Wilson also received annual salary increases in Columbus and Montgomery, with his last increase in October, 1991.[5] *Id.* at 48–49. However, at various times during his employment as a department manager at Gayfers in Montgomery, Wilson received evaluations that were somewhat critical of his work performance. For instance, store manager Neal Doblin ("Doblin") gave Wilson a negative evaluation on September 11, 1991; specifically, Doblin criticized Wilson's habit of changing his work schedule without advising management.[6] Additionally, after defendant Sue Groce ("Groce") replaced Doblin,[7] she evaluated Wilson on October 27, 1992, and identified the following five areas of substandard performance: (1) the need to focus on more detail work, (2) the need to develop teamwork and leadership, (3) improvement on follow-through and elimination of procrastination, (4) improvement of productivity, and (5) the need to dress more professionally. Ex. 4, Defs.' Br. in Supp. of Mot. for Summ.J. Groce also told Wilson that he would not be receiving a raise for the 1992 year and that in order for him to continue working at Gayfers he would need to improve in these areas. Wilson Dep. at 126, 128.

Groce and defendant Ron Parrish ("Parrish"), the store's operation manager, conducted a follow-up evaluation of Wilson's job performance on February 10, 1993. *Id.* at 132–44; *see also* Ex. 5, Defs.' Br. in Supp. of Mot.

---

5. After being transferred to Montgomery, Wilson received two raises: one on September 20, 1990, and one on October 6, 1991. Wilson Dep. at 54.

6. Citing to specific pages in Wilson's deposition and attached Exhibit 1, both parties agree the September 11, 1996, evaluation also criticized Wilson for using snuff in the store and wearing a shirt and tie 90% of the time. However, both parties failed to submit those deposition pages and the exhibit into evidence. Consequently, the court will only consider Doblin's critique of Wilson's scheduling changes.

7. The parties do not specify when Groce took over for Doblin as store manager.

for Summ.J. During this evaluation, Groce told Wilson that he had failed to correct the problems they had discussed in October, 1992, and she informed him that he would have to make a complete "turn around" within the next 30 days or he would be terminated. Wilson Dep. at 132–44; Groce Dep. at 176. Furthermore, if he so desired, he would be allowed to leave work, with pay, to search for another job. Wilson Dep. at 132–44. Wilson requested Groce allow him until February 18, 1993, to consider the options she had presented at the evaluation. Wilson Dep., Ex. 5. On March 17, 1993, Wilson submitted a written resignation to Parrish. *Id.* at 94–98.

Groce reports that from 1992 to February 1993, she took disciplinary action against two other department managers, Wayne Merritt ("Merritt") and Shirley Benbo ("Benbo"). Groce Dep. at 63–71. Using the same evaluation form with Merritt that she had used with Wilson, she provided a similar critique of Merritt's performance. *Id.* at 63–65. Merritt, however, was not terminated, because he was able to improve his department's performance to Groce's satisfaction. *Id.* at 64. Benbo was terminated after she violated company policy for either the second or third time regarding mark down procedures. *Id.* at 71. Groce also reports that she allowed two other department managers, Peggy Bracket ("Bracket") and Susan Godwin ("Godwin"), who were reportedly suffering from "deficiencies, to step down to the position of "sales associate." *Id.* at 67–69. Of the five "disciplined" department managers, only Benbo and Wilson were terminated.

After Wilson submitted his resignation, he received reports from various co-workers that Groce and Parrish had mocked Wilson's hearing disability.[8] *Id.* at 68–82. As a result, Wilson began to suspect that he had been mistreated by Groce and Parrish because he had a hearing disability. *Id.* at 157–58. In support of Wilson's claims, Bernard MacKenzie, a former co-worker of Wilson, has testified that he overheard Parrish

and Groce "mocking" Wilson's hearing problem and that they were always "riding" Wilson while he was department manager. MacKenzie Aff. ¶¶ 4, 5. Similarly, Luther Hicks, another former co-worker, also testified that he heard Parrish "on numerous occasions make intentional derogatory remarks regarding [Wilson's] hearing disability and his hearing aids" and that "[t]hese comments were often made in the presence of other employees." Hicks Aff. at ¶ 5.

On December 12, 1995, Wilson commenced this action, alleging that Gayfers, Groce, and Parrish violated the ADA and requesting both compensatory and punitive damages. *See* Pl.'s Compl. Wilson also brought forth pendent state claims for the tort of outrage, intentional infliction of emotional distress, and for conspiracy to defraud. *Id.* Defendants have moved for summary judgment of all counts.

## DISCUSSION

### I. Americans with Disabilities Act

■ The Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual."[9] 42 U.S.C. § 12112(a). Under the ADA, the plaintiff may prove a claim for discriminatory discharge in one of two ways. *Davis v. Cottage Hill Baptist Church*, 1995 WL 795673 *4 (S.D.Ala.1995); *see also, West v. Russell Corp.*, 868 F.Supp. 313, 317 (M.D.Ala.1994). "First, [the plaintiff] may present direct evidence of discrimination. Such evidence usually takes the form of statements made by an employer that evince discrimination based on, in this case, disability." *Davis*, 1995 WL 795673, at *4. Second, [the plaintiff] may establish his discrimination claim by "the use of indirect or circumstantial evidence." *Id.*

■ Where the plaintiff must rely on circumstantial evidence, as in the instant

---

8. Wilson also reports other incidents occurring in his presence when Parrish and/or Groce "mocked" him or otherwise mentioned his hearing disability or hearing aids. Wilson Dep. at 154–55, 179–80.

9. Title I of the ADA is codified at 42 U.S.C.A. §§ 12111–12117, while Title II is codified at 42 U.S.C.A. §§ 12131–12165.

case,[10] he must establish his claim of discrimination through the use of the McDonnell Douglas framework. *See generally McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). To establish a prima facie case under the McDonnell Douglas framework, the plaintiff must show: "(1) that he is a qualified individual with a disability; (2) that he has suffered an adverse employment action; and (3) that a causal connection exists between the adverse employment action and the disability." *Smith v. Upson County,* 859 F.Supp. 1504, 1514 (M.D.Ga.1994), *aff'd,* 56 F.3d 1392 (11th Cir.1995). After he has established his prima facie case, the burden of production shifts to the employer to offer a legitimate, nondiscriminatory reason for the plaintiff's termination. *Johnson v. Boardman Petroleum, Inc.,* 923 F.Supp. 1563, 1567 (S.D.Ga.1996). "Once these reasons are presented, the burden shifts back to the plaintiff to show that the reasons proffered were mere pretext. Plaintiff at all times carries the ultimate burden of proving by the preponderance of the evidence that the challenged employment decision was motivated by the presence of a disability." *Id.* (internal citations omitted).

### A. McDonnell Douglas Framework

 There is no question but that Wilson belongs to the protected class. Although he has not been formally diagnosed as having a hearing deficiency, he wears corrective hearing devices to compensate for a hearing loss. A real or perceived hearing loss is a disability within the meaning of the ADA.[11] *See, e.g., Sawinski v. Bill Currie Ford, Inc.,* 881 F.Supp. 1571 (M.D.Fla.1995); *see also Southeastern Community College v. Davis,*

442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). Moreover, it appears to be undisputed that Wilson is a "qualified individual with a disability." The term "qualified individual with a disability" is defined in the ADA as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the [position] that such individual holds or desires." 42 U.S.C. § 12111(8) (1994). Wilson performed his job as department manager for approximately 3 years, indicating that he was able to perform the essential functions of the job. Additionally, there is no question that Wilson suffered adverse employment action: he received two negative evaluations, was not given an annual raise, was told that he would be terminated within a month if he was unable to "turn around" his department, and was encouraged by Groce and Parrish to look elsewhere for employment.

 The disputed issue lies within the third prong: the requisite causal connection between the adverse employment action and the disability. Wilson must present evidence proving "discriminatory animus" or present evidence from which a discriminatory motivation may be inferred. *Johnson,* 923 F.Supp. at 1569. The court finds that Wilson has met his burden. Wilson, MacKenzie and Hicks have testified that Groce and Parrish mocked his hearing disability in and out of Wilson's presence. Additionally, Wilson has demonstrated that his job was put in jeopardy only after Groce became the store manager, for it was only then that he received such negative evaluations that prevented him from receiving his annual raise in salary and jeopardized his job.

 Gayfers, however, has met its burden in presenting a legitimate, nondiscrimi-

---

**10.** Direct evidence is "that evidence which, if believed, 'establishes discriminatory intent without inference or presumption.'" *Lewis v. Zilog, Inc.,* 908 F.Supp. 931, 951 (N.D.Ga.1995) (citing *Clark v. Coats & Clark,* 990 F.2d 1217, 1226 (11th Cir.1993)). Wilson has not presented direct evidence which establishes that any hiring or termination decision was based on his perceived disability.

**11.** The court notes that an individual may qualify as having a disability where he is regarded as

having an impairment that substantially limits one or more major life activities. 29 C.F.R. pt. 1630, app. § 1630.2(*l*); *see* EEOC: Definition of the Term "Disability" at § 902.8(a), 8 FED Manual (BNA) 405:7278 (1995). This reading is meant to protect individuals who are not substantially impaired but are treated by employers as if they were. *Id.* Wearing hearing aids, as Wilson does, would obviously create a perception of disability.

natory reason for Wilson's termination. The court notes that such a burden is "exceedingly light," as Gayfers must only "proffer reasons, not prove them." *Meeks v. Computer Assoc's. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994). In the instant case, Groce twice documented five areas of Wilson's performance which she considered to be substandard and she documented her attempts to correct those problem areas. Wilson, therefore, must take up the burden of production and rebut Gayfers' proffered reason.

■ The court finds that in his rebuttal of Gayfers' reason for his termination, Wilson has presented sufficient evidence to create a material issue of fact. Specifically, Wilson has created a question of fact as to whether he was treated in the same manner as other department managers. He has presented evidence showing that of five department managers, only two were fired: one (Wilson) for substandard performance and one (Benbo) for violating company policy. He has shown that while he was effectively terminated for his poor performance; Merritt, another department manager charged with poor performance, was not terminated. Wilson has also shown that while he was effectively terminated for his poor performance, Bracket and Godwin were allowed to "step down" to a lower position. This showing, combined with the testimony of Wilson's co-workers regarding Groce's and Parrish's statement about Wilson's hearing deficiency, is sufficient to create a genuine issue of material fact which should be decided by a jury. Accordingly, the court finds the defendants' motion for summary judgment with regard to Wilson's ADA claim is due to be denied.

### B. Punitive Damages

■ Wilson seeks both compensatory and punitive damages. Wilson may recover compensatory damages if he can prove, by a preponderance of the evidence, that the defendants intentionally discriminated against him because of his disability. *See Outlaw v. City of Dothan*, 1993 WL 735802 (M.D.Ala. 1993). Wilson may also seek punitive damages for violations of the ADA; however, they are only available if he can show that Gayfers engaged in intentional discrimination

*and* did so with malice or with reckless indifference to Wilson's federally protected rights. 42 U.S.C. § 1981a(b)(1).

For Gayfers to prevail on its motion for summary judgment of punitive damages, there must be no genuine issues of material fact on the question of whether Groce and Parrish "intentionally discriminated and did so maliciously or recklessly." *Ward v. Papa's Pizza to Go, Inc.*, 907 F.Supp. 1535, 1542 (S.D.Ga.1995). Wilson has presented little evidence to show ill will, malice or reckless indifference by the defendants, but through the affidavits of MacKenzie and Parrish, he has nevertheless produced evidence which could be construed by a factfinder to show malice or ill will on the parts of Parrish and, perhaps, Groce. Accordingly, given the fact-driven nature of this inquiry, the court finds that Wilson has introduced sufficient evidence to defeat Gayfers' motion for summary judgment with regard to punitive damages.

### C. Groce's and Parrish's Individual Liability

■ The Eleventh Circuit has rejected the concept of individual liability under the ADA, holding that the ADA provides only for employer liability. *Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir.1996). Specifically, the ADA prohibits discrimination by any "covered entity"; a "covered entity" is defined as "an employer, employment agency, labor organization or joint labor-management committee." 42 U.S.C. § 12111(2). The term "employer" includes "any agent of such person." 42 U.S.C. § 12111(5)(a). The Eleventh Circuit, adopting the reasoning of the Seventh Circuit, has held that the "agent" language is merely an expression of "*respondeat superior* liability of the employer for the acts of its agents." *Mason*, 82 F.3d at 1009. Accordingly, the court finds that Wilson's individual claims under the ADA against Groce and Parrish cannot be maintained and defendants' motion for summary judgment with regard to Wilson's ADA claims against Groce and Parrish is due to be granted.

## II. State Law Claims

### A. Outrage and Intentional Infliction of Emotional Distress

 Wilson claims that the defendants' treatment of him amounts to the intentional infliction of emotional distress and the tort of outrage under Alabama law. As the defendants point out in their brief, Alabama law recognizes the tort of outrage which encompasses the intentional infliction of emotional distress. *See Ex Parte Lumbermen's Underwriting Alliance,* 662 So.2d 1133, 1134 n. 1 (Ala.1995). Therefore, the court will adopt the defendants' approach and also treat the claims of intentional infliction of emotional distress and tort of outrage as a single tort of outrage, which occurs when "one who by extreme or outrageous conduct intentionally or recklessly causes severe emotional distress to another." *Angle v. Dow,* 822 F.Supp. 1530, 1545 (S.D.Ala. 1993). The court notes that "it is the province of the trial court to decide ... whether [the] defendant[s'] conduct is sufficiently outrageous or extreme as a matter of law." Id.

 To recover under the tort of outrage, Wilson must "demonstrate that the defendants' conduct (1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." *Barton v. American Red Cross,* 829 F.Supp. 1290, 1309 (M.D.Ala.1993) (quoting *Green Tree Acceptance, Inc. v. Standridge,* 565 So.2d 38, 44 (Ala.1990)), *aff'd,* 43 F.3d 678 (11th Cir.1994). It is unusual for a party to recover under the tort of outrage, for "the conduct complained of must be so extreme in degree as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized society." Id. For such behavior to be outrageous, it must be more than "mere insults, indignities, threats or annoyances." *Angle,* 822 F.Supp. at 1546.

 Wilson's "burden of proving the existence of the tort [of outrage] is a heavy

one," one which he has failed to meet. *See id.* at 1545. Although he has presented evidence of mocking or mean-spirited comments regarding his hearing disability, he has failed to demonstrate that they were more than mere indignities or annoyances. Accordingly, the court finds that defendants' motion for summary judgment on Wilson's tort of outrage claim is due to be granted.[12]

### B. Conspiracy to Defraud

 "A civil conspiracy requires a combination of two or more individuals to accomplish an unlawful purpose or to accomplish a lawful end by unlawful means." *McLemore v. Ford Motor Co.,* 628 So.2d 548, 550 (Ala.1993). "Where civil liability for a conspiracy is sought to be enforced, the conspiracy itself furnishes no cause of action. The gist of the action is not the conspiracy alleged but the wrong committed." *Id.* (quoting *O'Dell v. State ex rel. Patterson,* 117 So.2d 164 (Ala.1959) (internal citations omitted)). In the instant case, Wilson claims that Groce and Parrish "conspired to deprive and defraud" him of "compensation and benefits due him by unlawfully terminating his employment." Compl. at 4. To establish his conspiracy to defraud claim, Wilson must present evidence of a viable underlying fraud claim. *McLemore,* 628 So.2d at 550.

 In order to establish a prima facie claim for fraud, Wilson must show the following four elements: "(1) that the defendant[s] made a false representation to [him], (2) that the false representation related to a material fact, (3) that [he] justifiably relied on the false statement; and (4) that [he] sustained damages as a proximate result." *Braswell v. ConAgra, Inc.,* 936 F.2d 1169, 1174 (11th Cir.1991). In the instant case, Wilson alleges that the defendants falsely represented the reason for his termination and that he relied on that reason in tendering his resignation. Wilson, however, has failed to show that he was damaged as a

---

**12.** Because it is granting defendants' motion for summary judgment with regard to the tort of

outrage claim, the court does not address Wil-

proximate result of any misrepresentation made by the defendants.[13]

Wilson contends that he would not have resigned from his position had he known the "true" reason for the threatened termination. Therefore, presumably, he would not have been without a job at Gayfers after March, 1993. Such a claim is illogical. Assuming *arguendo* that Wilson had not believed Groce's reason for his termination, i.e., unsatisfactory job performance, and had not tendered his resignation, he still would have suffered the same damage: termination of his employment from Gayfers. It is clear to the court that whether Wilson resigned or not, Wilson's employment with Gayfers was at an end. Consequently, Wilson could not have legally suffered any damage as the result of any alleged misrepresentation. Because he is unable to establish one of the elements of his prima facie case of fraud, Wilson's entire conspiracy count must fail.

Accordingly, the court finds that defendants' motion for summary judgment on Wilson's claim of conspiracy to defraud is due to be granted.

## CONCLUSION

Based on the foregoing, it is CONSIDERED AND ORDERED that defendants' motion for summary judgment be and the same is hereby GRANTED in part and DENIED in part.

son's argument that there must be *respondeat superior* liability in the outrage claim.

13. The court does not find that Wilson was not damaged by these events, but only that Wilson did not suffer any damage as the result of any alleged misrepresentation.